UNITED STATES, Appellee

v.

RUDOLPH G. GARCIA, Merchant Seaman, Appellant

5 USCMA 88, 17 CMR 88

■■■■■■■■■■■■■■

No. 3086

Decided November 5, 1954

■■■■■■■■■■■■

Lt Col Edgar R. Minnich, U. S. Army, Maj Edwin Doran, U. S. Army, and 1st Lt Richard B. Dempsey, U. S. Army, for Appellant.

Lt Col Paul J. Leahy, U. S. Army, Lt Col William R. Ward, U. S. Army, and 1st Lt Elliott H. Eisman, U. S. Army, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

The accused, Garcia, a civilian seaman employed by the Military Sea Transportation Service, was convicted, following trial by an Army general court-martial in Japan, of (1) robbery, (2) wrongful appropriation of a motor vehicle, and (3) escape from lawful confinement—in violation of Articles 122, 121, and 95, respectively, Uniform Code of Military Justice, 50 USC §§ 716, 715, 689. He was sentenced to confinement at hard labor for nine months, to a fine of $500.00, and to further confinement until payment of the fine, but not in excess of four additional months. The convening authority approved the findings and sentence, and a board of review has affirmed. His petition for review having been granted, the accused questioned in this Court for the first time the jurisdiction of the court-martial which tried him. Since this challenge raised questions relating to the power of the court-martial, which required the action of a fact-finding body, we remanded the case to The Judge Advocate General, United States Army, for reference to a board of review for that purpose, without prejudice to the right of the accused to appeal from the subsequent decision. United States v. Garcia, 3 USCMA 851. A board of review examined into this issue, pursuant to our order, and concluded that the accused was subject to court-martial jurisdiction. Garcia again appealed to us, but, prior to hearing, the Government moved to dismiss on the ground that this Court is without jurisdiction to entertain the appeal. We are thus required to resolve the question of our own jurisdiction before considering that of the court-martial.

II

The pertinent sections of the Uniform Code—Articles 66(b), 67, 69, 50 USC §§ 653, 654, 656 — ■■■■■■ ■ dealing with the procedure for review by boards of review and appeals to this Court, provide:

"Art. 66. Review by the board of review.

• • • • • •

"(b) The Judge Advocate General shall refer to a board of review the record in every case of trial by court-martial in which *the sentence*, as approved, affects a general or flag officer or extends to death, dismissal of an officer, cadet, or midshipman, dishonorable or bad-conduct discharge, *or confinement for one year or more.*

• • • • • •

"ART. 67. Review by the Court of Military Appeals.

. . . . . .

"(b) The Court of Military Appeals shall review the record in the following cases:

"(1) All cases in which the sentence, as affirmed by a board of review, affects a general or flag officer or extends to death;

"(2) All cases reviewed by a board of review which The Judge Advocate General orders forwarded to the Court of Military Appeals for review; and

"(3) All cases *reviewed by a board of review* in which, upon petition of the accused and on good cause shown, the Court of Military Appeals has granted a review.

. . . . . .

"ART. 69. Review in the office of The Judge Advocate General.

"Every record of trial by general court-martial, in which there has been a finding of guilty and a sentence, the appellate review of which is not otherwise provided for by article 66, shall be examined in the office of The Judge Advocate General. If any part of the findings or sentence is found unsupported in law, or if The Judge Advocate General so directs, the record shall be reviewed by a board of review in accordance with article 66, *but in such event there will be no further review by the Court of Military Appeals except pursuant to the provisions of article 67(b)(2)*." [Emphasis supplied.]

Since no other category of Article 66 (b) is applicable, it is at once apparent that, unless the sentence in the case at bar is one which extends to confinement for one year or more, this Court is without jurisdiction to consider the appeal. In this connection, appellate Government counsel urge that the term "confinement"—as used in this Article—must be limited to confinement imposed as *punishment* for an offense, and does not include alternative confinement imposed merely as a means of compelling obedience to the sentence of the court. In support of this position, they rely on the case of United States v. Sarae, 9 CMR 633, in which an Air Force board of review was faced with the identical problem presented in the present appeal.

In the Sarae case, the accused was tried by general court-martial and sentenced "to pay the United States a fine of Two Thousand Dollars ($2,000.00), and to be confined at hard labor until such fine is so paid, but for not more than one year." The record of trial was referred to the board of review by The Judge Advocate General, in accordance with the provisions of Article 69 of the Code. The accused there urged, *inter alia,* that the case should have been referred under the terms of Article 66 (b). The board specifically noted that its determination of that question controlled the right of the accused to petition this Court, since—if properly referred under Article 69—no further review could be had, unless specific questions were subsequently certified by The Judge Advocate General. Holding that the case was correctly referred under the latter Article, the board distinguished between confinement imposed as punishment and that imposed to coerce the payment of a fine. Its members concluded that the term "confinement" as used in Article 66(b) must be limited to the type defined as punishment for an offense and does not include that imposed to enforce the sentence of the court.

In reaching this conclusion, the board cited the decision in United States v. DeAngelis [ACM 4455], 4 CMR 654, 726, *aff'd on appeal,* 3 USCMA 298, 12 CMR 54. That case involved a sentence which, as approved, included dismissal, total forfeitures, a fine of $10,000, confinement at hard labor for five years— the maximum imposable for the offense committed—and further confinement until payment of the fine, but not to exceed two additional years. We there adopted the view prevailing in civilian jurisdictions establishing a dichotomy between confinement adjudged as punishment and that imposed to compel payment of a fine. Rejecting the contention that the five-year sentence exhausted the punitive jurisdiction of the court-martial, and that the conditional portion was void, we held that the sentence imposed did not exceed the limi-

tations prescribed in Sections A and B, paragraph 117c, Manual for Courts-Martial, U. S. Army, 1949. As was pointed out by the board of review in that case:

"It is manifest, that in the event the accused fails to pay the fine, he may suffer confinement in excess of five years. However, the excess period that he remains in confinement while the fine remains unpaid does not constitute an increase in punishment for the offense, for, as pointed out in U. S. v. Ridgewood Garment Co. 44 F Supp 435, 436:

'There is a clearly understood distinction between imprisonment as a punishment for the offense, which is for a specified time and imprisonment until a fine is paid, which is not for a specified time by way of punishment, but is coercive in its nature, and designed to compel obedience to the Judgment of the court.' "

This view—that an alternative term of imprisonment in default of payment of a fine does not constitute part of the *punishment* for the offense—is widely recognized in both state and Federal jurisprudence and finds substantial support in other legal writings. Grier v. Kenan, 64 F 2d 605 (CA 8th Cir); United States v. Ridgewood Garment Co., 44 F Supp 435 (ED NY); McKinney v. Hamilton, 282 NY 393, 26 NE 2d 949; Peeples v. District of Columbia, 75 A2d 845 (Mun Ct of App, DC); 36 CJS, Fines § 11; 15 Am Jur, Criminal Law § 546.

In opposition to the motion to dismiss, appellate defense counsel contend that a provision for alternative confinement to insure payment of a fine must be included within the *sentence* for the purpose of determining the jurisdiction of this Court. Support for this position is found principally in the following provision of the Manual for Courts-Martial, United States, 1951, paragraph 126h(3):

". . . In order to enforce collection, a fine is usually accompanied by a provision *in the sentence* that, in the event the fine is not paid, the person fined shall, in addition to any

period of confinement adjudged, be further confined until a fixed period considered an equivalent punishment to the fine has expired (see app. 13, forms 21 and 22). The total period of confinement adjudged *in such a sentence* shall not exceed the jurisdictional limitations of the court (15b, 16b, 126c)." [Emphasis supplied.]

On the basis of the language emphasized above, the accused insists that the two terms of confinement imposed by the court-martial here must be aggregated; that the accused's *sentence* thus includes confinement for a period of 13 months; and that this case was properly referred to the board of review under Article 66(b), with attendant jurisdiction in this Court to grant review.

We believe this position to be well taken. At various points in the Uniform Code Congress spoke of "punishment," or referred to an accused's being "punished." See, e. g., Articles 19, 20, 55, 56, 80–134. However, in framing Article 66, which determines the jurisdiction of boards of review, and in large measure of this Court, Congress did not choose to utilize the term "punishment," and instead provided for mandatory review if "the *sentence* . . . extends to . . . confinement for one year or more." (Emphasis supplied.) We must assume that the choice of the word "sentence" over "punishment" was a deliberate one, and was calculated to suggest that, if the sentence in any way might operate to require that an accused spend as much as one year in confinement, then review by a board is required—whether or no the entire sentence to confinement may be regarded as primarily punitive. The phrase "extends to" seems to support this construction.

There is, of course, no doubt under the Manual language previously quoted that alternative confinement imposed for the purpose of compelling payment of a fine is nonetheless a part of the *sentence*. The provision for such a fine—and such a method of enforcement—appears among the sample sentence forms found in the Manual. See Forms of Sentences, Appendix 13, forms 21, 22, page 542. According to the Su-

preme Court, unless such alternative confinement is expressly included within the sentence, it enjoys no legal authorization. Hill v. United States, 298 US 460, 80 L ed 1283, 56 S Ct 760. Therefore, we are sure that the Code's phrasing signifies that jurisdiction exists in this Court to review a case resulting in a *sentence* like the present one, regardless of the circumstance that only nine months of the confinement constituted *punishment* for the purposes considered in the DeAngelis case.

In the Sarae case the board of review was of the opinion that, if Congress had proposed to include within the term "confinement" as employed in Article 66(*b*) that which was imposed to enforce payment of a fine, rather than as punishment, *qua* punishment, it would have provided to this effect specifically. We do not hesitate to take the antithetically opposed view—that is, that, if Congress had intended to cause jurisdiction of a board of review—and resultantly of this Court—to turn on punishment, rather than on the sentence imposed, *this* would have been proclaimed.

Moreover, although the word "punishment" had been used in Article 66(*b*), a holding that boards of review are invested with jurisdiction by that Article over cases like that involving the present accused would not be unsupported by authority. In Articles 19 and 20 Congress empowered special and summary courts-martial to adjudge as "punishment" confinement not in excess of six months and one month respectively. The Manual's paragraph 126*h* (3), supra, makes it clear that, in computing total confinement within the meaning of these Articles, there must be included confinement imposed as an alternative to insure the collection of a fine. See also Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 182. This provision of the Manual—constituting as it does a contemporaneous administrative interpretation of the power Congress intended to confer on special and summary courts-martial—would suggest that, even had Article 66(*b*) made use of "punishment" as a substitute for "sentence," the alternative confinement must be included for the purpose of determining whether a board of review possessed jurisdiction. Since, however, the term "sentence" *was* employed, there is—as previously suggested—an even stronger case for ruling that Article 66(*b*) embraces the present case.

No sort of repudiation of DeAngelis is involved. In that case we were not at all concerned with interpreting *Congressional intent,* but instead with determining what the *President* had directed in the exercise of his virtually limitless power to fix maximum punishments for military crimes. The question there was simply one of whether the alternative confinement exceeded the limitation prescribed in the Table of Maximum Punishments. The designation of a fine as a "permissible additional punishment" under Section B, Table of Maximum Punishments, Manual, paragraph 127*c*, page 228, served as an ample answer to the contention that the limitation had been exceeded. It was indeed difficult to believe that the President had intended that a fine might lawfully be imposed as additional punishment, yet at the same time that the court-martial lacked power to include within the sentence the alternative confinement ordinarily used to coerce payment of the fine. Moreover, as the Table of Maximum Punishments suggests by its very title, the maxima for confinement provided there apply to *punishments.* Accordingly, it was quite allowable to conclude that the President did not intend these maxima to be concerned with alternative confinement, which traditionally has not been considered part of the *punishment*—although it certainly does constitute part of the *sentence.*

Certain broad considerations distinctly support our view that jurisdiction exists in the case before us now. Ordinarily a fine—rather than a forfeiture —is adjudged against a civilian who is subject to military law. Manual, paragraph 126*h*(3). To enforce collection, this fine is usually accompanied by an alternative period of confinement. Were this alternative confinement to be excluded in construing Article 66(*b*), the jurisdiction of boards of review, and

our own as well, would be curtailed—substantially and regrettably—in cases involving civilian defendants. Since the area of military trial of civilians is an extremely sensitive and delicate one—and especially so as to issues of jurisdiction—it is highly unlikely that Congress would have chosen sharply to limit appellate review in such cases. It seems probable that the wording of Article 66(b) was carefully intended to avoid this result.

In the Federal courts an indigent prisoner, who is sentenced to confinement to coerce payment of a fine, may, after thirty days of imprisonment, obtain relief through the execution of a pauper's oath. 18 USC § 3569. That this statute is applicable to military prisoners seems doubtful. See Winthrop's Military Law and Precedents, 2d ed, 1920 Reprint, page 420. In light of this doubt, it would be especially harsh to hold that review under Article 66(b) is precluded if it rests in any degree on a sentence to alternative confinement.

It may also be observed that confinement imposed to coerce the payment of a fine—although not deemed punishment—would nevertheless seem to support a petition for habeas corpus. Cf. Hill v. United States, supra. Of course, the want of jurisdiction over a civilian would constitute a valid ground for the grant of such a writ. It is highly probable that Congress desired to provide for extensive military appellate review of cases resulting in long periods of confinement imposed to collect fines from convicted civilians—particularly a review of the court-martial's jurisdiction—in order to minimize resort to habeas corpus in Federal civilian courts. In any event, the Uniform Code, we are sure, does require such review.

### III

In determining the jurisdiction of the court-martial — as distinguished from that of ourselves—we must first inquire into the effect which must be given the circumstance that the accused, at his trial, failed to contest jurisdiction; entered a plea of not guilty; and joined in a detailed jurisdictional stipulation with the prosecution. This stipulation asserted:

"1. That on 16 July 1952, the accused was a civilian member of the crew of the United States Naval Ship, the General E. T. Collins, a vessel then and at all times mentioned herein, operated by and under the exclusive command of the Navy Department of the United States in transporting members of the armed forces of the United States and their dependents between the United States and Japan.

"2. That for several months continuously before 16 July 1952, the said vessel had been engaged in the aforesaid transportation, and the accused came to Japan as a civilian member of her crew in July 1952, on a trip of said vessel from the United States on which said vessel transported to Yokohama, Japan, a large number of the armed forces of the United States and such dependents aforesaid.

"3. That three or four days after her arrival in Japan and in July 1952, said vessel left there for the United States carrying a large number of the members of such armed forces and their dependents, but the accused did not sail on this return trip to the United States for the reason that he was then detained by the United States military authorities in Yokohama, Japan, pending an investigation."

In military law, a failure to contest jurisdiction does not operate to waive a want thereof. In the Manual for Courts-Martial, supra, paragraph 68 b(1), it is provided that:

"If the court lacks jurisdiction or if the charges fail to allege any offense under the code the proceedings are a nullity. These objections cannot be waived and may be asserted at any time."

Subsequently, in paragraph 68b(2), it is made clear that jurisdiction over the person, as well as jurisdiction over the subject matter, may not be the subject of waiver.

The general civilian rule seems to be

94

that, if a defendant enters a plea in the trial court and presents his defense at large, he is precluded from raising on appeal an objection that the trial court was without jurisdiction over his person. Cf. Ford v. United States, 273 US 593, 71 L ed 793, 47 S Ct 531; 3 Am Jur, Appeal and Error § 306; 22 CJS, Criminal Law § 147. Accordingly, it has been ruled—despite the provision in the Federal Rules of Criminal Procedure, 12(*b*)(2), to the effect that lack of jurisdiction shall be noticed by a court at any time during the pendency of proceedings—that a defendant will not be permitted to question personal jurisdiction after entering a plea and seeking to defend on the merits. Pon v. United States, 168 F 2d 373 (CA 1st Cir); United States v. Rosenberg, 195 F 2d 583 (CA 2d Cir), cert den 344 US 838, 97 L ed 652, 73 S Ct 20, 21, rehearing denied, 344 US 889, 97 L ed 687, 73 S Ct 180, 134.

In the Pon case, the court construed the phrase "lack of jurisdiction," as used in the Federal Rules, to refer to jurisdiction over the subject matter—which it is clearly established a defendant may not waive. See, United States v. Corrick, 298 US 435, 80 L ed 1263, 56 S Ct 829. There is more than a little indication that the draftsmen of the Manual for Courts-Martial meant to follow Federal Rule 12(*b*)(2). See Legal and Legislative Basis, supra, page 83. And, if we were to transpose the interpretation of the Federal Rules mechanically, we would be obliged to hold that entering a plea of not guilty —as opposed to standing mute—prevented a subsequent contest concerning jurisdiction over the person. See Manual, paragraph 70*a*. However, we do not believe that the language of paragraph 68*b* as a whole permits this result. Moreover, as we pointed out in an early decision, military jurisdiction over civilians is not a matter lightly to be presumed, and must be shown clearly. United States v. Marker, 1 USCMA 393, 3 CMR 127. Thus, in accordance with the views expressed there, we must conclude that entry of the plea of not guilty here failed to confer jurisdiction.

The accused's agreement to the stipulation, however, is an entirely different matter—for it involved a positive and affirmative choice on his part. The distinction between a mere waiver of rights, on the one hand, and consent, on the other, is well known. United States v. Young, 2 USCMA 470, 9 CMR 100. The former, of course, may result chiefly from inaction, but something more must be present if we are to find consent. Despite our unwillingness to apply in military courts the well-established civilian rule that the issue of jurisdiction over the person may easily be waived, we find no harshness in upholding *consent* by an accused civilian to a stipulation of facts that would show him to be a person subject to the exercise of military jurisdiction over his person. One source remarks that "Everywhere jurisdiction of the person of the defendant may be acquired by consent of the accused." 14 Am Jur, Criminal Law § 214. Of course, military jurisdiction over civilians does not necessarily require their consent, or even their knowledge. McCune v. Kilpatrick, 53 F Supp 80 (ED Va). Yet, to some extent, jurisdiction over civilians does possess consensual aspects —as is evidenced by the circumstance that voluntary employment, a contractual relation, can serve to create such jurisdiction under Article 2(11) of the Uniform Code. Cf. Article 2(3). An early case—Ex parte Jochen, 257 Fed 200 (SD Tex)—suggested that there is no:

". . . violence done to the dictates of humanity and reason when a person who has become voluntarily a member of the military establishment has martial law invoked against him; the maxim volenti non fit injuria at once arises, or as it was otherwise stated by Attorney General George H. Williams, in 14 Ops. Attys. Gen. 22:

'Persons who attach themselves to an army going up on an expedition against hostile Indians may be understood as agreeing that they will submit themselves for the time being to military control.'"

Similarly we find no violence to the

dictates of humanity and reason in holding that one who consents to trial by a military court, and enters into a jurisdictional stipulation, cannot for the first time during appellate proceedings question the tribunal's jurisdiction over his person and repudiate that stipulation.

In terms Article 2(11) of the Uniform Code, 50 USC § 552, provides:

"Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States and without the following territories: That part of Alaska east of longitude one hundred and seventy-two degrees west, the Canal Zone, the main group of the Hawaiian Islands, Puerto Rico, and the Virgin Islands."

Concerning the Article's reference to treaties or agreements to which the United States is or may be a party, it is to be observed that American military jurisdiction was in no wise limited by the applicable agreement between the United States and Japan—the Administrative Agreement which took effect April 28, 1952, pursuant to Article Three of the Security Treaty between the two countries. In Article XVII of the former document, it was agreed that:

"2. Pending the coming into force with respect to the United States of the North Atlantic Treaty Agreement referred to in paragraph 1, the United States service courts and authorities shall have the right to exercise within Japan exclusive jurisdiction over all offenses which may be committed in Japan by members of the United States armed forces, the civilian component, and their dependents, excluding their dependents who have only Japanese nationality. Such jurisdiction may in any case be waived by the United States."

The phrase "civilian component" is said to refer to:

". . . the civilian persons of United States nationality who are in the employ of, serving with, or accompanying the United States armed forces in Japan, but excludes persons who are ordinarily resident in Japan or who are mentioned in paragraph 1 of Article XIV. For the purposes of this Agreement only, dual nationals, United States and Japanese, who are brought to Japan by the United States shall be considered as United States nationals." [Article 1 (b), Administrative Agreement, supra.]

It should be stated parenthetically that paragraph 1 of article XIV relates to certain civilian businessmen, a category wholly inapplicable to the accused.

We have announced that stipulations are to be construed so as to effectuate the manifest intent of the parties thereto. United States v. Cambridge, 3 USCMA 377, 12 CMR 133; United States v. Niolu, 4 USCMA 18, 15 CMR 18. The obvious purpose of the parties to the stipulation before us here was to establish facts which show a status for the accused under which he would without doubt be subject to military jurisdiction. The stipulation plainly asserted that the accused was an employee serving on a ship operated in support of the American military forces and under the control of the Navy. As an employee of the Government, engaged in service on such a vessel, there is no doubt that the accused was subject to military jurisdiction. McCune v. Kilpatrick, supra; Ex parte Gerlach, 247 Fed 616 (SD NY); In re Berue, 54 F Supp 252 (SD Ohio); Ex parte Falls, 251 Fed 415 (D NJ); Op JAGN 1952/109, April 24, 1952, 2 Dig Ops Judge Advocates General Armed Forces, Courts-Martial § 47.1.

The defense argues that the existence of an employer-employee relationship involves a conclusion of law, and that a stipulation concerning such a matter is meaningless—for the reason that stipulations must deal with items of fact. To be sure, the employment relationship does possess legal aspects. However, the manner in which employment comes about is in no way an esoteric matter.

Thus, we doubt that a witness who testified that he was "employed" by the X corporation would thereby have expressed an objectionable legal opinion. See Manual, paragraph 138e. The assertion that the accused was a member of the crew of the USNS General Collins was simply a composite of factual assertions, and—in accord with the intent of the parties—should be treated in this manner. Cf. McGrew Paint and Asphalt Co. v. Murphy, 387 Ill 241, 56 NE 2d 416; Moore v. City of Kokomo, 223 Ind 293, 60 NE 2d 530; H. Hackfeld & Co. v. United States, 197 US 442, 49 L ed 826, 25 S Ct 456. In any event, we believe that the stipulation was understood by all of its parties to be directed toward establishing jurisdiction on the part of the court-martial. It constituted a positive act by the accused definitely calculated to lead to this end.

No injustice exists in denying the accused leave to contradict his stipulation at this level, and in holding that he is now estopped by his original consent to that jurisdictional stipulation. We are convinced that the stipulation was not made improvidently. The accused was charged, inter alia, with robbing one Japanese National and misappropriating the motor vehicle of another. These two offenses constituted the core of the present charge-sheet. No American civilian court could lawfully have tried him. If he was not to be tried by court-martial, in what forum would his trial be held? Obviously in a Japanese court—for the Japanese waiver of jurisdiction over civilian personnel under the Administrative Agreement does not extend beyond dependents and the civilian component of the Armed Forces of the United States. Since Garcia was the dependent of no military person, he would clearly fall within Japanese jurisdiction if he was no longer a member of the civilian component—a term paralleling the categories of civilians treated in Article 2(11). In light of the nature of the charges and the national origin of the prosecuting witnesses, it is not surprising that the accused bent his energies to the establishment of membership in the civilian component.

We are not inclined at this time to grant him a second election.

IV

As an alternative ground for holding that the court-martial possessed jurisdiction over the accused here, we rely on the board of review's findings of fact, which—appropriately titled—appear in 13 CMR 271, and will not be repeated here. In light of those findings, we are sure that, regardless of his employment status at the time of the offense, the accused was then "accompanying" the Armed Forces. In this connection Garcia's situation must be distinguished from that of the defendant in United States v. Schultz, 1 USCMA 512, 4 CMR 104. In discussing that accused's status under Article 2 (11) of the Code, we emphasized that —subsequent to the termination of his employment with a project or agency of the United States Government— Schultz reverted to the status of a "commercial entrant." Under directives applicable at that time, he was not deemed to be accompanying occupation forces in Japan. We added that Schultz apparently "was allowed to merge with the civilian population."

Garcia, on the contrary, did not engage in any sort of commercial enterprise subsequent to his arrival in Japan. Indeed, his sole activities while there seem to have been ones of a criminal nature. When he sought to merge with the civilian population, it is quite clear that the Japanese authorities did not acquiesce in his purpose. Instead—as revealed by the board's findings of fact —he was detained by the civilian authorities on June 1, 1952, as an illegal entrant to Japan and later delivered to United States military authorities. Nothing indicates that this Japanese view was altered at any time thereafter —and prior to the commission of the accused's first offense on July 16, 1952. Obviously a merchant seaman who "jumped ship," or missed movement, on May 14, 1952, and was designated as an illegal entrant by local officials on June 1, 1952, at no time merged with the civilian population. Such a merger requires at least some sort of authoriza-

tion of his presence by local officialdom —or, in the alternative, a stay of such duration as to constitute acquiescence in his presence. It is clear that Garcia does not qualify. Similarly he could not have been deemed a person "ordinarily resident in Japan," within the meaning of Article 1, paragraph (b) of the Administrative Agreement between the United States and Japan, which excludes such residents from the civilian component of the Armed Forces.

More applicable than the Schultz case to the present situation are certain Federal precedents. For instance, a Federal District Court was called on to determine the amenability to military jurisdiction of a civilian who was present in Germany in 1946, but whose employment by the United States, or an agency thereof, had terminated prior to trial. The Court remarked that, regardless of such termination of employment, "petitioner was not free to come and go as he pleased. He was not allowed to merge with the population of Germany. He was there only with the consent of the Theater Commander." And so that accused was held to have been subject to military jurisdiction. Grewe v. France, 75 F Supp 433 (ED Wis).

Another civilian had been employed in Eritrea in 1942 in connection with certain salvage operations conducted there by the United States Armed Forces. He was tried by court-martial for larceny, and one of the issues in a subsequent habeas corpus proceeding had to do with the effect on military jurisdiction of the termination of the defendant's employment with a Government contractor prior to the commission of the alleged offense. It was argued in his behalf that, on the termination of his employment, he might lawfully have remained in Eritrea—and that nothing in the contract of employment, under which he entered that country, required his return to the United States. However, the Government produced evidence to the effect that entry of foreign civilians was forbidden, save for the performance of specific duties connected with the war effort, or by reason of their attachment to consular offices. Moreover, under military directives then in force, civilian nationals of the United States were required to leave the country on completion of their employment on military projects. A Federal Court of Appeals upheld the conviction on the ground that the accused was "accompanying" the United States Army in Eritrea. Perlstein v. United States, 151 F2d 167 (CA 3d Cir), cert dismissed, 328 US 822, 90 L ed 1602, 66 S Ct 1358. Accord, In re Di Bartolo, 50 F Supp 929 (SD NY).

The Army's Judge Advocate General rendered a similar opinion relating to a civilian who was brought to Bermuda to work for a contractor on an American base there—with the expectation and agreement that he would be returned to the United States on termination of the employment. Following the termination of the contract, he appears to have committed an offense while waiting transportation home. The Judge Advocate General concluded that the accused was subject to military law for the consequences of his conduct during this period and emphasized that:

"Administratively and legally, he has not been merged in the population of Bermuda; but, as is shown by the papers in reference, he is a citizen of the United States brought to Bermuda for a limited time by a contractor with the United States Army to work on a project of the United States Army, upon an express agreement with him and with the colonial government that he will be returned by the contractor to [the] United States upon completion of such employment, and he is now for a brief period awaiting such return. In my opinion such a person is one 'accompanying . . . the armies of the United States.'" [JAG Op., 250.401, GCM Juris., Dec. 27, 1941.]

This opinion of The Judge Advocate General is clearly entitled to weight. Hiatt v. Brown, 339 US 103, 94 L ed 691, 70 S Ct 495. As is also true of the judicial constructions previously set forth, this weight is considerably enhanced by the subsequent Congressional reenactment of legislation providing military jurisdiction over persons "accompanying" the armed services over-

seas. Helvering v. R. J. Reynolds Tobacco Co., 306 US 110, 83 L ed 536, 59 S Ct 423; Stout v. Hancock, 146 F 2d 741 (CA 4th Cir), cert den, 325 US 850, 89 L ed 1971, 65 S Ct 1086.

The Federal judicial precedents agree with The Judge Advocate General of the Army in emphasizing the question of whether a civilian employee was accepted by the local civil authorities as their own responsibility and had merged with the local population. Under this criterion Garcia was clearly within the court-martial's jurisdiction. Both Grewe v. France, supra, and Perlstein v. United States, supra, attached significance to the circumstance that an accused civilian's original entry was made with the aid of the military authorities and could not have been effected otherwise. Here, too, Garcia is included. His entry into Japan was not made in conformity to the customary Japanese passport and visa laws. Instead, he entered as an employee of the American Armed Forces—a member of the civilian component of those Forces—and thus, under Article IX, paragraph 2 of the Administrative Agreement, was exempt from the usual Japanese immigration regulations. As previously recited, Japan at no time exhibited any sort of desire to claim Garcia as a resident or domiciliary of its own, and at no time did his status change to that of a person accepted for immigration pursuant to the normal Japanese procedure.

Just as in the instance considered by The Judge Advocate General, the United States had agreed with the local government—Japan in this instance—that the former would transport the erstwhile American employee from the foreign country within a reasonable time after the end of his employment. Article IX, paragraph 5. In conformity to the usual maritime practice, Garcia had been issued "workaway orders," under which he would be permitted to earn his return transportation to the United States by service as a seaman on some other vessel operated by the United States Navy. Understandably, the findings of fact do not make clear whether the accused was in Japan at the time of the crimes simply because no vessel requiring his services had sailed for the United States—in which case his situation would be identical with that of the laborer in Bermuda—or whether he had decided against the use of Government transportation. It may be observed parenthetically that omissions of relevant facts of this nature would appear to be inevitable, if we are to permit an accused person to repudiate at the appellate level a jurisdictional stipulation made during the course of trial. In any event, following the termination of his employment—if the employment did in fact terminate —the accused was in Japan with the full concurrence of the American military authorities, and only because of this. Moreover that approval of his presence there was limited to a temporary period—as appears from the fact that workaway orders had been issued. Indeed, for the military authorities to have permitted the accused to remain indefinitely in Japan without means of support would, we think, have violated the spirit of the Administrative Agreement. These circumstances—together with others already related—reveal sufficient connection with the Armed Forces to disclose that Garcia was "accompanying" those Forces. Cf. United States v. Biagini [ACM 6341], 10 CMR 682.

The findings of fact disclose still other contacts between the accused and the American military authorities—a factor which bolsters our conclusion. For example, during the two months elapsing between his failure to sail with his ship and the commission of the first alleged offense, the accused was twice tried by American courts-martial—apparently quite without protest on his part against their authority to do so. As a result of one such trial he appears to have enjoyed guardhouse hospitality for twelve days, and it is quite possible that he was in American confinement at other times. Incidentally, a desire to foreclose the court-martial's knowledge of these prior connections with the military authorities—contacts we think relevant in the determination of his status—may have constituted a further reason for the willingness of the accused to enter into a jurisdictional stipulation. Without relating the nature of

**99**

other evidence bearing on jurisdiction, and without speculating as to further evidence the Government might have produced—had the point been contested at the trial—we are sure that the court-martial did possess jurisdiction over Garcia.

The basic purpose of Article 2(11) is to provide a system of law administration for civilians who accompany our Armed Forces overseas. See In re Di Bartolo, supra. In the absence of that jurisdiction, certain serious consequences may be expected to follow. One such consequence would be the inability of the military authorities to deal decisively with the conduct of camp followers, and other "accompanying" persons—an inability which might adversely affect military operations and morale. An Armed Force will be responsible in the public eye for the personnel, both military and civilian, it brings into a foreign country. The esteem in which that Armed Force is held will be considerably diminished if such personnel commit serious depredations. However, the service concerned cannot successfully deter such depredations by persons as to whom it lacks power to punish. A second consequence might take the form of a reluctance on the part of other powers to permit the presence of our Armed Forces within their borders. Absent Article 2(11) jurisdiction, such countries would be aware that, together with our armed forces, would come groups of civilians whom our military authorities were without jurisdiction to control or to punish for misconduct. While the foreign governments concerned would as a normal thing have authority to try such individuals in their own courts, it is not inconceivable that they might dislike the task of washing the "dirty linen" brought in by United States Forces. A third possible consequence is that the contraction of American military jurisdiction would, as a practical matter, serve to enlarge the jurisdiction of the courts of the host country. For example, if Garcia is not subject to the exclusive jurisdiction of the United States, as a member of the American civilian component, he would clearly fall within the jurisdiction of Japanese courts. It is no unusual thing for a nation to desire to control the discipline of its nationals overseas, instead of having such matters dealt with by a foreign power. However, it would often be necessary to yield jurisdiction over American civilians to a foreign country by default were we to take a narrow approach to the problem of jurisdiction under Article 2(11) of the Code.

When the statute from which Article 2(11) derives was under discussion in 1912 before the House Committee on Military Affairs, General Crowder, then The Judge Advocate General of the Army, explained the need for the provision by referring to a case which arose during the second American expedition in Cuba. Two soldiers were charged with the homicide of certain Cuban Nationals. Under the Articles of War then in effect, a court-martial lacked jurisdiction to try the soldiers, and of course, no American civilian court had jurisdiction over them. Thus —General Crowder commented—the Army was faced with a choice between: (1) surrendering them for trial by a Cuban court; and (2) utilizing the authority of the provisional government to create an American military commission. The second course was taken. See Madsen v. Kinsella, 343 US 341, 96 L ed 988, 72 S Ct 699, footnote 20. Congress must have realized from the first, therefore, that foreign courts would often be available to punish persons "accompanying" American armies overseas. Notwithstanding this, however, it determined to provide the basis for a broad exercise of American jurisdiction over such persons through use of courts-martial. It seems to us that this purpose of Congress justifies a liberal construction of Article 2(11). Cf. In re Di Bartolo, supra. Under that construction—we believe—when a non-military person voluntarily accompanies our Armed Forces overseas, he remains subject to the Uniform Code until such time as the foreign country in which he is situated may be said, on one theory or another, to have assumed responsibility for him, and thus to have relieved those Forces of their duty to control his conduct. Accordingly, affirmance of the court-martial's juris-

100

diction over Garcia is dictated—and the decision of the board of review is affirmed.

Chief Judge QUINN and Judge LATIMER concur.