UNITED STATES, Appellee

v

JOSEPH RUBENSTEIN, A person accompanying the armed
forces of the United States without the territorial
jurisdiction of the United States, Appellant

7 USCMA 523, 22 CMR 313

524

No. 7278

Decided January 25, 1957

*Myron G. Ehrlich, Esq.,* and *Joseph Sitnick, Esq.,* argued the cause for Appellant, Accused. With them on the brief were *Lieutenant Colonel Stanley S. Butt, Colonel A. W. Tolen, Major Peter Portrum,* and *Captain Donald C. Helling.*

*Major John M. Rankin* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis, Lieutenant Colonel Francis P. Murray, Major Stanley I. Harper,* and *Captain Anthony Ortega, Jr.*

GEORGE W. LATIMER, Judge:

The accused, a civilian, was tried by a general court-martial sitting in Japan for the commission of a great number of offenses. As a result of the findings by the court and the action of the convening authority, however, he stands convicted of only two offenses, i.e., larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and wrongful evasion of Japanese customs duties, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The original sentence, to be confined for eighteen months and to pay a fine of $7,500, or in default of payment thereof, to be confined for an additional two years, has been affirmed by intermediate appellate agencies. We granted review on seven issues, but our holding that the court-martial had jurisdiction to try the accused under Article 2(11) of the Code, 10 USC § 802, renders several of the related issues moot or immaterial, and they will not be discussed. Those believed to be still pertinent will be stated as we turn to each in our discussion.

In November or December 1948, the accused arrived in Japan as a "clerk-typist" employee of the Department of the Army. He remained in that position until April 15, 1951, when he obtained employment as manager of the Landing Strip Civilian Club. The Club was a nonappropriated fund activity located at an American air base near Tokyo, Japan. It was operated for the benefit of civilian employees of the Air Force on duty at the base. The Club was governed by Army and Air Force regulations and there appears to be no dispute about the fact that it was subject to military control and supervision. It was regulated by the base commander and accused was able to carry on his black market operations because the Club was authorized to operate as a quasi-military agency. Even though his employment was changed, the accused lost none of the privileges normally incident to being closely allied with the services overseas, for thereafter, just as before, he was entitled to use the Army Post Office system, was accorded post exchange and commissary privileges, was entitled to housing on the base, and was paid in military currency. His new employment by the Club was pursuant to an agreement in which he expressly contracted to remain subject to military law.

During the period from July to October 1951, the accused purchased some 700 cases of a named whiskey from Barclay & Company, importers, on the false representation that the beverage was to be used in the normal operations of the Club. In all transactions, save one, he presented purchase orders made out in the name of the Club in which he further falsely asserted that he was an officer of the armed forces. Instead of purchasing the liquor for the Club, the accused was, in fact, part of an illegal syndicate which was trafficking on the Japanese black market. By fictitiously trading through the Club, the operators were able to evade the payment of a very high Japanese import duty. For reasons fully developed later in this opinion, we are free to say that Barclay & Company would not have sold the whiskey to the accused had it known the true situation, for it was permitted to do business in Japan solely because of a license granted to it by the Supreme Commander for the Allied Powers, and this license was revocable whenever the Commander deemed it militarily expedient or found that the company had violated any law, regulation, or provision of its license. The license contained a provision prohibiting bulk sales to individual occupation personnel and that clause was being violated, because when the scheme was laid bare the true purchaser was none other than the accused.

On April 12, 1952, and April 15, 1952, the accused was interrogated by agents of the Office of Special Investigations and informed that he was suspected of the offenses later alleged against him. When he informed the agents that he intended to leave Japan by ship on April 22, 1952, he was directed to report to the investigator's office daily after April 15, 1952. Two days later, without informing anyone and despite the fact that he was en-

titled to free transportation and subsistence by ship and train to his home in Detroit, Michigan, pursuant to his contract of employment, the accused, at considerable expense to himself, flew to the United States by commercial aircraft. On June 4, 1953, he returned to the Far East and while in Korea as a commercial entrant, he was apprehended by Air Force authorities and brought to Japan to stand trial.

## II

The first assignment of error which bears discussion has to do with jurisdiction, for it is contended █ by defense counsel on appeal that the accused was not subject to trial by court-martial. To support the assertion it is argued that the only basis for claiming court-martial jurisdiction finds its root in Article 3(a) of the Code, 10 USC § 803, which has been held to be unconstitutional. We agree that the Supreme Court in Toth v Quarles, 350 US 11, 76 S Ct 1, 100 L ed 8 (1955), held that Article 3(a), in so far as it purported to continue court-martial jurisdiction over members of the armed forces whose status as persons subject to the Code had been terminated prior to trial by an honorable discharge, was unconstitutional. However, the real basis for asserting jurisdiction over the accused in this instance stems not from that Article but from Article 2(11), 10 USC § 802, because Rubenstein was accompanying the armed forces outside the territorial limits of the United States. Under our interpretation of the Toth decision, it did not touch on that Article.

In United States v Burney, 6 USCMA 776, 21 CMR 98, we held that Article 2(11), supra, was a valid exercise of the Congressional power to make rules for the government and regulation of the land and naval forces, and that the Article was not infected with any Constitutional infirmities. Therefore it only remains to be decided whether the accused, as a matter of fact, falls within the category of persons "accompanying the armed forces" overseas. In the end, a holding on that issue depends upon whether his presence at the air base was not merely incidental to, but directly connected with or dependent upon, the activities of the armed forces or their personnel in Japan. United States v Burney, supra; United States v Garcia, 5 USCMA 88, 17 CMR 88. While there is little doubt but what he was accompanying the Army when he went overseas in 1948, the present controversy raises two other problems of importance. The first is whether the accused severed all connections with the armed forces, reverted to the status of a commercial entrant, and merged with the civilian population at the time when he became manager of the Landing Strip Civilian Club. United States v Schultz, 1 USCMA 512, 4 CMR 104. If he did not, then the second issue is whether, by returning to the United States, the accused effectively removed himself from the clutches of military law.

The only significant facts in support of accused's contention are these. On May 18, 1951, a month █ after he entered upon his new employment, he was advised by Headquarters, Japan Logistic Command, Civilian Personnel Section, that the Army had no objection to his separation as a Department of the Army civilian to accept private employment if he elected to do so; that the United States would no longer be obligated, under his old contract of employment, to transport him back to its shores; that the cost of transportation to his home must be borne by the Landing Strip Civilian Club under its contract with him; that the Army would no longer furnish him logistic support; that he was authorized to stay in Japan indefinitely as a commercial entrant; that he must register as such with the provost marshal in Tokyo; that he was subject to the directives of the Supreme Commander Allied Powers; and that he must exchange his passport for a new one showing his new status as a commercial entrant. The accused complied with this last requirement, and we are sure that this compliance, when considered in connection with the conditions outlined in the communication, effectively terminated his status as a Department of the Army employee.

527

However, it does not necessarily follow that the termination of his Army employment removed him from the category of persons identified as those accompanying the armed forces overseas.

While we may, for the purposes of argument, assume that the accused could have changed his status to that of a commercial entrant before these offenses were committed, the facts conclusively establish that he chose not to do so. It is to be noted that he did not completely sever his close relationship with the Armed Forces, for he left the Army to accept employment with the Landing Strip Civilian Club, a nonappropriated fund activity of the Air Force, and as such, a Government instrumentality. Standard Oil Co. of California v Johnson, 316 US 481, 62 S Ct 1168, 86 L ed 1611 (1942). His contract of employment expressly recited that the Club operated under Army regulations and the accused obligated himself to manage the Club in such a manner as to comply with all occupation rules or regulations. Furthermore, by its terms, his duty station was to be a military installation; he was to be furnished living quarters and subsistence at the air base in accordance with Army regulations; and he was guaranteed transportation to his home in the United States upon termination of his employment. When the contract is considered in its fullness, it becomes crystal clear that the accused was subject to military law as a person accompanying the armed forces. Certainly he voluntarily consented to remain amenable to military law for the contract expressly recited that he was to be regarded as a member of the class of persons subject to trial by courts-martial.

If further facts are needed to establish beyond peradventure of doubt accused's status as a person accompanying the armed services, they are easily found in the record. He was issued an Army identification card and used it; he was assigned and used a billet at the air base until February 13, 1952; he received a post exchange ration card; he was entitled to make purchases at the air base commissary; he purchased gasoline for his automobile from army and air force filling stations; he used the Army Postal Service; he received his salary in military payment certificates; and in every way he conducted himself as a member of the occupation forces. From all that has been said it necessarily follows that court-martial jurisdiction existed over accused at the time when the offenses were committed, but that is not the end of our inquiry, for jurisdiction must also exist as of the time of trial. United States v Marker, 1 USCMA 393, 3 CMR 127; United States v Schultz, 1 USCMA 512, 4 CMR 104.

It is contended by appellate defense counsel that accused's contract of employment with the Landing Strip Civilian Club expired April 15, 1952, and that whatever might have been the situation before that date, thereafter he was no longer accompanying the Air Force. We think the contention is unsupported by this record. Certainly the accused was subject to military law when the offense was committed, and he voluntarily returned to the area of his crime, so that he was physically within the jurisdiction of the military commander in both instances. While a temporary absence from the area may not deny military courts the authority to punish an offender over which they once had jurisdiction, we need not answer that question, for under the facts of this case, we are sure accused cannot assert that the Government lost its right to proceed. Either shortly before or on the date when his employment terminated, the accused contemplated departing for the United States by ship. His passage was booked for April 22, 1952. No doubt this means of conveyance was pursuant to his contract with the Club, and the seven-day time interval between the termination of his employment and his planned departure from Japan was so short that it is reasonably inferable that the ship was the first available water transportation. However that may be, the accused during the interim did not obtain private employment and did nothing to merge with the Japanese civilian community. Furthermore, he was interrogated concerning the crimes of which he was

528

suspected on April 12, 1952, and April 15, 1952, and certainly not later than the last mentioned date he was so clearly a suspect as to be put under an informal type of restriction. The investigating agent testified that he could have placed the accused under arrest, but did not do so because accused had been so cooperative. Whether he made a mistake in only requiring the accused to contact him daily is beside the point, as accused cannot use the leniency extended to him as a license to run from military control.

Further interviews with the accused were made impossible, for on April 17, 1952, he, under unexplained circumstances, left Japan by commercial airliner. While he insists his hasty departure terminated court-martial jurisdiction over him, we conclude otherwise. There are too many facts which point unerringly to a calculated plan to flee. He had a fixed sailing date; he accelerated his departure; he knew he was under suspicion; he was entitled to free transportation; and he did not wait for it at considerable expense to himself. From those facts and circumstances any fair-minded person would be driven to conclude that he fled to avoid criminal prosecution. Viewed in the light of ordinary human behavior, his act was the act of a desparate man, caught up in a web of illegal operations largely spun by himself. It is the rule for military courts-martial, as well as for civilian tribunals, that flight to avoid prosecution does not terminate jurisdiction which has already been acquired. We shall refer to two civilian cases to support that rule.

In United States v Handy, 176 F2d 491 (CA5th Cir) (1949), a situation very similar to the one presently before us was presented, for the accused had been a civilian employee of the Army Post Exchange System in Frankfort-am-Main, Germany. On July 31, 1948, he was arrested and thereafter charged with a violation of the Articles of War. The sworn charges were served upon him shortly before December 9, 1948, and trial was scheduled to be held on that date. Pending trial, the accused had not been placed in confinement, but had merely been restricted to the limits of the city. He took advantage of this grant of comparative freedom of movement to escape and return to this country by air. He was arrested in Texas by military authorities, with a view to returning him to Germany to stand trial. In upholding the District Court's denial of his petition for habeas corpus, the Circuit Court assumed without question that jurisdiction under Article of War 2(d) had attached while the accused was in Germany, and that even though the war had officially ended, his subsequent flight to this country had not divested the military of its power to try the accused.

In Perlstein v United States, 151 F 2d 167 (CA3d Cir) (1945), the Court of Appeals for the Third Circuit was presented with this factual situation. On September 26, 1942, the accused, whose contract of employment overseas had been terminated, boarded a ship provided by the Army to return to the United States. After the ship sailed, it was discovered that he had committed a theft that very day. He was removed from the vessel by military authorities at a port entered by the ship while en route to these shores. It was the view of that court, and the authorities relied upon by it, that sufficient had been done with a view toward trial while the accused was still accompanying the Army to render him amenable to court-martial jurisdiction. Here the case is somewhat analogous, for, even though the accused was not incarcerated, the investigators had gone so far as to inform him that he was being investigated for the offenses in issue at this trial and he was placed under restraint by being ordered to report daily. That. constitutes a first step toward prosecution. Cf. United States v Schultz, supra.

We have not overlooked the fact that the board of review, in the course of its opinion below (United States v Rubenstein, 19 CMR 709, 783), observed that after accused "fled and before he was apprehended in Korea on 4 June 1953, it appears that his activities had been such that at sometime during that period his said status [as a person accompanying the armed forces overseas] probably terminated." Based

**529**

on that observation, the board of review assumed that jurisdiction under Article 2(11) had terminated. However, that holding is not res judicata as to us, and we reach a diametrically opposite conclusion for the reason that there is no legal justification for a holding that the status of accused changed for jurisdictional purposes. An accused cannot terminate jurisdiction over his person by breaking restraint to avoid prosecution, and his unilateral attempts to defeat the law will not divest the court-martial of jurisdiction. The Government, by its acts, may lose the power to try an accused by court-martial, but the accused cannot take the authority away. To hold otherwise would be to place too great a premium upon the degree of expertise attained by wrongdoers in avoiding apprehension.

### III

The next assignment questions the propriety of the method used by the Air Force in acquiring physical custody of the person of the accused. We have earlier mentioned that in June 1953, Rubenstein was in Korea as a commercial entrant; that he was placed under arrest by military authorities; and that he was transported to Japan for trial. Although the accused urges that he was thereby wrongfully deprived of an asserted right to a preliminary hearing and removal proceedings under Rules 5 and 40 of the Federal Rules of Criminal Procedure, 18 USC, we are sure the argument will not bear close scrutiny.

In treating this contention we direct attention to the fact that the accused was seized in a foreign country and transported to another nation, which had gained the status of a sovereign state. See Treaty of Peace with Japan, 3 U. S. Treaties 3169, effective April 28, 1952. Thus there is no merit to the contention that there was any attempt on the part of the military authorities to avoid the jurisdiction of a court created by Article III of the Constitution. See Toth v Quarles, supra. However salutary the Federal rules may be, they do not purport to operate within the area of a foreign sovereign, but are expressly limited to proceedings in and before the courts and commissioners of the United States sitting within the geographical limits of the United States and the principal part of its territories. Rules 1 and 54, Federal Rules of Criminal Procedure, supra. Therefore, it is readily ascertainable that, on the basis of the facts now before us, the accused was and is not entitled to the removal proceedings provided by these Rules.

Furthermore, even if it is assumed that the accused was unlawfully seized in Korea and transported to Japan, he would have no grounds to complain of a lack of jurisdiction in the court-martial, for the power of a court to try a person for a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a "forcible abduction." Frisbie v Collins, 342 US 519, 72 S Ct 509, 96 L ed 541 (1952); Gillars v United States, 182 F2d 962 (CA DC Cir) (1950). If the arrest in this instance was unlawful, which we do not concede, accused's remedy for that wrong lies elsewhere, perhaps in a civil action for damages, and not here. So far as we are able to ascertain, there is nothing in the Constitution or the Code that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.

### IV

In stating the facts earlier, we mentioned that Barclay & Company received the purchase price of the whiskey from the accused at the time of each transaction, and from this it is argued by defense counsel that the evidence is insufficient to establish larceny by false pretenses. The basis for that assertion is the hypothesis that no offense is committed where a seller of property receives the exact sum for which he bargained. In developing this assignment of error, and for the purposes of argument only, accused makes a concession to the effect that the liquor was obtained from the importer through the false representation that accused was acting in his capacity as manager of

the Landing Strip Club. Nevertheless, he urges that the conviction may not be sustained, absent any showing that the seller was actually defrauded, i.e., suffered a pecuniary loss. However, we are sure the hypothesis is not supported by the better reasoned authorities and is not sound law.

In 35 CJS, False Pretenses, § 28, page 671, we find an appropriate statement which will serve as our starting point:

"... Hence, as a rule, the crime is not committed if the prosecutor gets out of the transaction just what he bargained for. [However] Except under a few statutes, it is not necessary, to constitute an offense, that the prosecutor has suffered, or will necessarily suffer, actual pecuniary loss; if he has been placed by the fraud of accused in such a position that he may eventually suffer loss, or if he does not receive for the money or property parted with the thing promised or represented by accused, even though he receives something else, regardless of whether such thing received is of equal value, less value, or no value at all, it is sufficient."

The thrust of this statement tends to bring to the fore the question of just what was bargained for in a given transaction, and while a case on all fours has not been found, it is illuminating to see how other courts have dealt with the problem under somewhat similar circumstances.

In People v Raines, 66 Cal App2d 960, 153 P2d 424 (1944), the accused sold a restaurant to Miss X for a sum of money, after representing to her that he had almost 9,000 meat ration points to his credit at the bank. It later developed that he had only 1,300 points to turn over. It was shown that the restaurant itself was worth the full purchase price, but that the number of ration stamps to be delivered was one of the effective inducements in the mind of the purchaser. After stating these circumstances, the California Court of Appeals held:

"The fact that the property purchased was worth the consideration paid therefor does not constitute a defense to the charge of grand theft if the jury believed, supported by substantial evidence, that defendant, with intent to defraud, knowingly made false representations that certain facts existed for the purpose and with the effect of inducing the prosecuting witness to part with something of value. People v. Bryant, 119 Cal. 595, 597, 51 P. 960; People v. Foster, 117 Cal. App. 252, 253, 3 P. 2d 586."

In State v Considine, 56 RI 456, 186 Atl 676 (1936), the accused negotiated six installment notes to Corporation X, accompanied by conditional sales agreements for jewelry. He represented that he had received the notes in payment for jewelry which he had sold. After the defendant had fled from the scene, X Corporation learned, for the first time, that the notes and contracts had been signed by their respective makers only to accommodate the defendant. In affirming the conviction for false pretenses, the Court rejected accused's argument that the notes were genuine and that X Corporation had suffered no loss as a result of his misrepresentations, saying:

"... We do not feel that the defendant derives any benefit from such an argument. In making this claim, he overlooks an all-important consideration: namely, that the company made it clear to the defendant, at the very beginning of their business relations, that it would discount no notes for him unless the conditional sale agreements in connection with those notes were assigned to it when such notes were discounted. The company was entitled in these transactions, not only to the willingness of the makers of the notes to pay them, but also to the security of the conditional sale agreements and of the property therein described."

In State v Sargent, 2 Wash2d 190, 97 P2d 692 (1940), opinion adhered to, 2 Wash2d 190, 100 P2d 20, the accused induced the victim to exchange his stock in A Corporation for accused's stock in B Corporation on the false representation that accused would be able to sell the B Stock for the victim at a profit

**531**

in a few days. In testing the sufficiency of the indictment to allege an offense, the Court said:

"It will be noted that there is no allegation that Marion was defrauded, in the sense that he suffered any pecuniary loss. For aught that is charged, he may even have gained by the transaction. The appellant urges that this vitiates the information; but, as we read the statute, the gist of the offense is obtaining property from an owner by the use of false and fraudulent representations or pretenses, and whether or not the owner suffered a pecuniary loss is immaterial. State v. Miller, 212 Mo. 73, 111 S.W. 18; People v. Bryant, 119 Cal. 595, 51 P. 960; People v. Bartels, 77 Colo. 498, 238 P 51."

In military law, we find a similiar principle supported by the reported cases. In United States v Turiano, 13 CMR 753, an Air Force board of review had before it a conviction of larceny, based on obtaining property by means of false pretenses. There the accused had secured blank medical prescription forms. He prescribed for benzedrine tablets and filled in false names as the patients for whom the drug was to be obtained. He subscribed fictitious names of Air Force medical officers as the attending physicians. The prescriptions were presented and filled by different drug stores and the purchase price required by the druggist was paid in all instances. There was a Federal statute prohibiting the sale of the tablets without a prescription from a duly licensed doctor, and the drug stores would not have sold the benzedrine if they had known the prescription was not validly signed by a physician authorized to practice in the State. The conviction was affirmed even though the seller obtained the full purchase price for the article sold. The board of review stated its reason in the following language:

"As to the first contention listed above, it is true that the owners of the property involved, i.e., the named drug stores, suffered no pecuniary loss in the transactions. It is likewise clearly established, however, that the pharmacists involved required a prescription signed by a physician before they would sell benzedrine to a customer. Thus, although the prescription was not the sole basis or only moving consideration upon which the pharmacist transferred the ownership of the property involved and the payment of money was necessary to completion of the transaction, the obtaining of such property was as a result of the false pretense in the misrepresentation of fact as to his authority to purchase benzedrine and as to the validity of the prescription. Thus it has been said that:

'In addition to other kinds of facts, the fact falsely represented by a person may be his power or authority to effect a certain result, his opinion or his intention . . .'
and that

'Although the pretense need not be the sole cause inducing the owner to part with his property, it is necessary that it be an effective (and intentional) cause of the obtaining.' (MCM, 1951, par 200a [5]; see also Wharton's Criminal Law, 12th Ed, Vol 2, sec 1442; ACM 6417, Gaines, 9 CMR 854)."

The foregoing authorities are consistent with the principles governing the crime of larceny as set out in the Code and the Manual. In defining the offense of larceny by false pretenses, Article 121 of the Code provides in substance that any person subject to military law, who wrongfully obtains from the possession of the true owner any personal property, with intent permanently to deprive the owner of the use and benefit thereof, is guilty of larceny. Little imagination is needed to know that obtaining possession of a third person's property by misrepresentation is wrongful.

In amplification of the codal provision, the Manual provides that a false pretense is a false representation of past or existing fact; and that, in addition to other kind of facts, the fact falsely represented by a person may be his power or authority to effect a certain result. Certainly the facts of this

case bring it well within the principles proclaimed. In selling whiskey in Japan, Barclay & Company bargained for more than the mere purchase price. It was permitted to transact business in that area under strict restrictions imposed by the Supreme Commander Allied Powers, and it bargained for lawful transactions which would not jeopardize its privilege to do business in Japan. There is a close parallel between the facts of this case and those found in the case last discussed above. There the druggist bargained for a genuine prescription when he sold the narcotics, as well as their purchase price. Here the Company contracted for valid requisitions as part of the consideration for the sale of its whiskey. Its privilege to do business was subject to immediate cancellation if it engaged in questionable transactions, and there was no escape clause in its permit to the effect that unless sales to unauthorized persons were knowingly made the license would not be revoked. Undoubtedly the privilege to transact business in Japan was a valuable right and one which should not be placed in danger by false certificates that purchasers are operating within the law. Because of the circumstances reflected by this record, we are satisfied the Company had so much to lose and so little to gain from any illegal operations that its officials would not have permitted these transactions to have taken place had they known the true facts. The officers so testified, and that position is consistent with good business practices. In a real sense, and as a result of accused's misrepresentations, the Company received a great deal less than it bargained for. In addition, the accused gained possession of property which he would have been unable to obtain had he truthfully reported the facts, and he has offered nothing by way of evidence or argument to weaken the Government's proof that his possession was made possible solely by his false representations. We, therefore, conclude the Government established every essential element of the crime of larceny by the means alleged.

Accordingly, the decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The majority relies upon United States v Handy, 176 F2d 491 (CA5th Cir) (1949), and Perlstein ▮▮▮▮ v United States, 151 F2d 167 (CA3d Cir) (1945), to support its conclusion that military jurisdiction over the accused was not ended when he returned to the United States. The Perlstein case is inapplicable because at all times from the commission of the offense until his conviction the accused was a person accompanying the armed forces. In Handy the accused was served with sworn charges, placed in arrest, and the charges were referred to trial before he breached his restraint and returned to the United States. Under these circumstances, the court held that the accused could not by his flight "change his status and deprive the military of the jurisdiction and authority over him already acquired." Ibid page 492. The cases cited in the Handy opinion are even more informative as to what is required to fix jurisdiction. Representative is Barrett v Hopkins, 7 Fed 312 (D Kan) (1881). In that case Chief Judge McCrary stated the rule as follows: "The general rule is that when the jurisdiction of a court attaches in a particular case by the *commencement of proceedings and the arrest of the accused,* it will continue for all the purposes of the trial, judgment, and execution." (Emphasis supplied.)

The rule announced by Judge McCrary was expressed as early as 1830 by the Massachusetts Supreme Judicial Court. In what is regarded as one of the leading cases on the subject, the court noted in In re Walker, 3 Am Jurist 281, that the accused had been "arrested or put in confinement, and charges were preferred against him . . . and this was clearly a sufficient commencement of prosecution to authorize a court-martial to proceed to trial." A review of the cases convinces me that the civilian courts have consistently required that charges be served with a view to actual trial as a minimum re-

**533**

quirement for attachment of jurisdiction. See United States v Reaves, 126 Fed 127, 131 (CA5th Cir) (1903); In re Carver, 103 Fed 624 (D Maine) (1900).

The military has apparently enlarged upon the jurisdictional rule. It has maintained that an arrest with a view to trial is sufficient for the attachment of jurisdiction. See Winthrop, Military Law and Precedents, 2d ed, 1920 Reprint, page 90; Davis, A Treatise on the Military Law of the United States, 3d ed, page 59. Even this enlarged military rule, however, recognizes that more than mere investigation is required to fix jurisdiction. In the Digest of Opinions of The Judge Advocate General of the Army (1868), it is said (page 210): ". . . to this rule [that jurisdiction ends] there is an exception in a case where a prosecution has been *formally commenced* . . . as by an *arrest or by the service of charges upon him, with a view to his trial.*" (Emphasis supplied.) In my view, the interrogation of the accused and the direction given to him by an investigating agent to report did not constitute such formal proceedings as contemplated either by the civilian rule or the military enlargement of that rule. What the investigating agent could do is one thing. What he actually did is another. In my opinion, therefore, when the accused returned to the United States, at the time that he did, he terminated his status as a person accompanying the armed forces in the field. His later presence in Korea as a commercial entrant did not reestablish his status, or otherwise make him subject to the Uniform Code. See United States v Gallagher, 7 USCMA 506, 22 CMR 296.

I further disagree with the majority's holding on the ground that it decides a question of fact which should properly be decided by a court-martial. Since the majority says that jurisdiction was not terminated because the accused "fled [from Japan and the military] to avoid criminal prosecution," I suppose it would follow the rule that departure from the jurisdiction alone does not constitute flight. In addition there must be a purpose or intent to avoid prosecution. See Donnell v United States, 229 F2d 560 (CA5th Cir) (1956). The accused's intention is a question of fact which should have been, but was not, submitted to the court-martial. United States v Ornelas, 2 USCMA 96, 6 CMR 96, 101. See also my dissent in United States v Taylor, 4 USCMA 232, 15 CMR 232.