UNITED STATES, Appellee

v

GEORGE ELBERT JOHNSON, Ship's Serviceman Seaman,
U. S. Navy, Appellant

6 USCMA 320, 20 CMR 36

No. 6428

Decided September 2, 1955

*Major Charles J. McCaffrey,* USMCR, argued the cause for Appellant, Accused.

*Major Charles B. Guy,* USMC, argued the cause for Appellee, United States.

Opinion of the Court

PAUL W. BROSMAN, Judge:

The charge and specification under which the accused in this case was tried by a general court-martial alleged that, on January 2, 1951, he had deserted his ship, and had remained absent in desertion until his apprehension on May 21, 1954. However, the court-martial found that, although he had been guilty of absence without leave for the period named, he lacked the state of mind required for desertion. The findings and the sentence—to bad-conduct discharge, total forfeitures, confinement at hard labor for six months, and reduction in grade to seaman recruit—were approved by the convening authority, save for minor modifications, and a board of review has affirmed. Before us now is the question of whether the court-martial possessed jurisdiction over the accused as a member of the United States Navy at the time of his allegedly unauthorized absence.

II

On November 4, 1947, Johnson, the appellant here, had entered on a three-year Navy enlistment, but in May of 1950 he executed an agreement to extend this contract for one year. Although he indicated at the trial a belief that, under this extension, he would have been entitled to discharge in May 1951, it seems clear that, in fact, the new obligation would have bound him to serve until November of that year. In any event, in the autumn of 1950 he appears to have determined to replace the one-year extension agreement with a

**321**

six-year re-enlistment—and executed papers appropriate to accomplish that purpose.

According to the accused's account, he was on this occasion handed a certificate of discharge from the original three-year enlistment—although no such document was tendered in evidence at any time. Thereafter, on some unspecified date during the first half of November 1950, Johnson was informed that he might well be deemed ineligible to enter on the requested six-year re-enlistment. He testified, however, that he was assured that an attempt would be made to solve this problem so that he might be permitted to serve the six-year term for which he had offered to contract. For more than a month Johnson remained with his ship, the USS MACON, and continued to perform normal duties. Then, as that vessel was due to sail on an extended cruise, he seems to have determined to grant the Navy no further opportunity to clarify his status—and so failed to return from authorized leave.

The appellant maintained vehemently that he had not intended to shirk his obligations to the Navy at the time he failed to move with the MACON. Instead, he had simply considered that the receipt of a discharge had operated to terminate all such duties, and that accordingly he was free to return to his home, once it became reasonably apparent that he was not to be accepted for the proposed six-year re-enlistment. While he conceded that some unofficial person may have mentioned casually the possibility that—despite the claimed discharge—he would be required to serve under the original extension to which he had agreed in May 1950, he denied having been told anything of the sort by any person in authority. The Government, on the other hand, produced evidence which, in this particu-

lar, suggested strongly the very antithesis of the accused's version.

## III

One ground for the conclusion of the board of review that the court-martial possessed jurisdiction over Johnson lay in its finding of fact that—although discharge and re-enlistment papers were prepared for him—the commanding officer of the MACON did not at any time execute the documents necessary to accomplish the separation and re-entry into the service. It has been suggested by Government appellate counsel that, in light of this finding, no substantial question remains concerning the Navy's—and resultantly the court-martial's—jurisdiction over the accused.

There are twin rejoinders to this contention. In the first place—and for whatever the point is worth—the court-martial itself, which is charged with *primary* responsibility for the determination of issues of fact, may well have reached a conclusion opposed to that of the board.[1] It will be recalled that the accused had readily conceded that, when he failed to rejoin the MACON on January 2, 1951, he had no thought of returning at any later time either to that ship or to the Navy. And he sought to justify this conduct by emphatic testimony to the effect that he had been granted an honorable discharge which, in his opinion at least, ended all claim the Navy may have had to his further services.

The defense argument, at the trial, of course, possessed a double aspect. It was first said that Johnson was no longer a member of the Naval Service on January 2, 1951, and so could not be deemed guilty of so much as an unauthorized absence. Secondly, it was argued that, although he had in fact been absent without proper authority, his

---

[1] It is recognized, of course, that boards of review—as distinguished from this Court—possess a certain sort of fact-finding power. Uniform Code, Article 66, 50 USC § 653. In the exercise of this authority a board may, on occasion, differ with a court-martial, the primary fact-finder, in its view of the data of the case. However, it is clear that it may not do so in all instances—and this, we believe, is one in which it may not decide against an accused in the face of an inferential finding by the court-martial in his favor.

322

genuine belief that he had become a civilian for every purpose precluded the existence of the *mens rea* required for desertion. The findings of the court-martial rather clearly betoken an acceptance of the second alternative tendered by the accused—a view which, although possible, would hardly have been taken had the members of the court been convinced that he had on no occasion received a certificate of discharge, however conditional.

In any event—and apart from what has been said above—the law officer failed wholly to comply with the instructional requirements set out by us in United States v Ornelas, 2 USCMA 96, 6 CMR 96. There the accused testified in a desertion case that at no time had he been inducted into the Army—but, despite a defense request, no instruction was supplied the members of the court advising them that they must first find that the accused had been a member of that Armed Service before they might lawfully find him guilty of having deserted it. In the case at bar, too, no instruction was furnished respecting the defense theory that the accused had not been guilty of desertion, or even of unauthorized absence, for the reason that he had previously been discharged. This omission is the more puzzling since the defense explicitly requested an instruction phrased along these lines, and the law officer does not appear to have believed that Johnson was subject to military jurisdiction as a matter of law. On the other hand, he did charge the court gratuitously on numerous legal principles which bore no conceivable relevance to the matters to be determined by them.

### IV

We feel sure that the only prospect for affirmance here lies in the Government contention that the accused's subjection to military jurisdiction was established at the trial level *as a matter of law*. Cf. United States v Rodriguez, 2 USCMA 101, 6 CMR 101. In this latter case jurisdiction was demonstrated by testimony showing that the accused had voluntarily accepted benefits intimately associated with the enjoyment of military status, and thereby had entered into a constructive enlistment—this regardless of the failure of Army officials to observe the usual induction formalities. It has been urged that a similar approach must be invoked by us in the present case.

Johnson's testimony, however, leaves much room for doubt that a constructive enlistment was effected. He recited, for example, that he had remained with the USS MACON on an interim basis only—and at the request of that vessel's officials—for the sole purpose of permitting further investigation of his eligibility for re-enlistment. The benefits received by the accused—as he tells the story—were not at all tendered on any sort of implied condition that he enter on a specified term of service with the Navy. Moreover, the defense's evidence was calculated to indicate that at no time had Johnson given the Navy reason to infer from his acceptance of benefits that he meant to relinquish in any degree whatever civilian status he had obtained by virtue of the discharge he claimed he had received. Accordingly, it may be argued with some force that the accused should receive from us a no less favorable jurisdictional treatment than he would have obtained had he accepted all benefits involuntarily. In this event, of course, no constructive enlistment could be said to exist. United States v Holleman, 3 CMR(AF) 450; see also United States v Reid [ACM 8288], 15 CMR 899.

However this may be, we are convinced that, as a matter of law, the accused *was* a member of the Naval Service when he failed to rejoin his ship on January 2, 1951. This conclusion is based on a careful scrutiny of the entire transaction of which the purported discharge constituted a part. Heretofore, in discussing the status of one discharged before the normal enlistment expiration date for the purpose of permitting re-enlistment, we have said that the basic intendment of the parties to such a transaction is "to facilitate the administration and effectuation of a continuous term of service." United States v Solinsky, 2 USCMA 153, 7 CMR 29. We remarked there, too,

that it was "not intended to return a soldier to a civilian status and then have him once again become a soldier."

Under other circumstances a discharge is executed with an eye to the return of a military person to civilian life—and so it is permitted to immunize him against trial by court-martial for all offenses preceding re-enlistment, should he later re-enter one of the Armed Services. Hirshberg v Cooke, 336 US 210, 93 L ed 621, 69 S Ct 530. But, as a discharge effected for the sole purpose of facilitating re-enlistment lacks the purpose of permitting a return to civilian life, we have held that a separation of this nature fails to end liability to trial by court-martial for prior crimes. United States v Solinsky, supra.

Within the present context, too, we are sure that a discharge issued for the purpose of allowing re-enlistment—like the one Johnson maintains he received here—operates differently with respect to military jurisdiction than would one executed where no re-enlistment was contemplated, and where the normal enlistment period of the person discharged is not abbreviated. The significant thing in the instant case is that both parties intended that Johnson should not be restored to civilian life by the discharge—but instead that he should be retained in the Navy for an additional period of time. Although his wish to contract for six years of additional service was not effectuated, why should this circumstance curtail his retention under the one-year voluntary extension of enlistment?

Not uncommonly are courts called on to remove the debris when some portion of a projected transaction is said to be illegal, or is impossible of execution. As a general thing in an instance of this sort an effort is made to conform the legal result to the situation the parties would have desired had they foreseen the events which later operated to frustrate the project. For example, in dealing with problems of wills many courts recognize the doctrine of "dependent relative revocation." Accordingly, if a testament is purportedly revoked by a later one, which itself is held invalid after the testator's death,

the earlier document will be revived in effect to transfer the decedent's property. See, e.g., 57 Am Jur, Wills, § 514, et seq; 68 Corpus Juris, Wills, § 483.

The primary purpose of the parties in the case at bar—from which no departure can be discerned—was to retain Johnson as a sailor for at least one additional year from that date in November 1950 on which his original three-year enlistment would have expired. The discharge—if one was granted him—was intimately correlated to that intent, and was subject to all of the conditions required logically thereby. Of course, the most fundamental of these was the implied one that the attempted six-year re-enlistment be realized. As an Army board of review phrased it in an opinion quoted by us in the Solinsky case:

". . . [T]he discharges were accomplished prior to the expiration of each accused's term of enlistment and they were obviously predicated upon re-enlistment in the Regular Army prior to the regular expiration of their term of enlistment."

With this in mind, the board of review commented in the instant case as follows:

". . . Of course it is conceivable that the commanding officer did sign the discharge and reenlistment before the defect in the service record was discovered. Even in that event, however, the action could not effect the cancellation of the extension of enlistment unless the reenlistment contract was valid (BuPers Manual, Art C–1406(9)(b), then current; now Art C–1406(8)(b))."

And in a remarkably similar case a Navy board spoke to the following effect:

". . . On 10 September 1952 he was obligated to serve on active duty under an existing naval reserve enlistment until August 1954. This discharge and reenlistment in the regular navy affected [sic] on 11–12 September was in our opinion part and parcel of the same transaction initiated on request of the accused and which could not be carried out by his commanding officer within the

324

purview of his authority except as an integrated transaction which would not change the continuous service status of the accused. If invalid or ineffective for that purpose, which we do not hold, then the accused continued to serve under his existing enlistment." [United States v Smith, 15 CMR 543, 547.]

We advert, as well, to certain provisions of law which leave no doubt regarding both the purpose of the parties and the conclusion we should reach here. By Public Law 624, approved on July 27, 1950, 64 Stat 379, the Eighty-first Congress granted to the President authority to extend for a period not to exceed twelve months enlistments in any component of the Army, Navy, Air Force and Marine Corps. Under Executive Order 10145, which took effect on July 29, 1950, President Truman extended for one year all enlistments which—like the accused's original three-year contract—would otherwise have expired between that date and July 9, 1951. See 15 F R 4883. Of course, the Order stated expressly that military personnel remained free voluntarily to extend their enlistments, or to re-enlist.

For the Navy to have sought to grant to Johnson an unconditional discharge and release from his original enlistment would in a real sense have defied the very purpose of this Executive Order and the enabling statute. An unconditional discharge—were it to be held legally effective—would have accorded to him the windfall of special exemption from the applicability of Executive Order 10145 if, for some reason, his attempted re-enlistment failed of approval. Therefore, it is plausible to argue that any unconditional discharge which may have been tendered by the Navy to Johnson would have been invalid, because it contravened the mandate of superior authority. Cf. Neary v Greenough, 120 F Supp 833 (D Maine); McFarland v Zuppann, 82 F Supp 526 (MD Penn); Ex parte Roach, 244 Fed 625 (ND Ala); United States v Reid, supra; United States v Wimer, 1 CMR (AF) 308.

Regardless, however, of the validity of any purportedly unconditional discharge which might have been issued to the appellant, we are convinced that there was no slightest purpose on the part of Naval officials to grant such a separation. After all, it is a well-established canon of construction that a court should avoid the interpretation of ambiguous action in such a manner as to raise questions concerning its legality. Surely under that principle the delivery of a certificate of discharge to Johnson must be considered to have amounted to no more than an effort—wholly consistent with Executive Order 10145—to grant him *"a privilege to substitute, during a continuation of his service,* an enlistment" for six years, but in no wise to attempt to release him unconditionally from Naval jurisdiction. See United States v Bridges [ACM 7944], 15 CMR 731, 735; United States v Isidore [ACM 5625], 7 CMR 595, 599.

The substitution sought simply failed of effect because of the accused's apparent ineligibility for re-enlistment, but he distinctly remained in the Navy —and the discharge, if any, became a nullity. Cf. United States v Daniels, 279 Fed 844 (CA 2d Cir). The significant thing, we think, is that the accused was at no time afforded an *opportunity* to alter his status as a member of the Naval Service. Cf. United States v Solinsky, supra; United States v Bridges, supra; United States v Isidore supra. Consequently he remained subject to Naval discipline by virtue of a voluntary one-year extension based on the agreement of May 1950. Whether he was also subject thereto by reason of an involuntary extension of his enlistment by Act of Congress and Executive Order we need not now decide.

We acknowledge that the recent case of United States v Keating, 121 F Supp 477 (ND Ill), seems opposed to our conclusion. See also Roberson v United States, 124 F Supp 857 (Ct Clms). We shall not pause to determine whether that decision may be distinguished on some narrow ground for—as has been remarked elsewhere—"Assuming, however, that the Roberson case is applicable, this Court is disinclined to accept it as a controlling precedent." Neary v Greenough, supra, at page 839.

**325**

## V

The remote possibility suggests itself that, although Johnson was within Naval jurisdiction when he failed to return to the MACON on January 2, 1951, he may have been absent therefrom with proper authority because of his receipt of a valid discharge. Unfortunately, for this position, however, he was fully aware of having signed the agreement to extend his original enlistment for one year, and was also cognizant—as he testified—that enlistments had been automatically extended for that period by law. He even concedes that he had been told in November of 1950 that he might be required to complete his old enlistment—and there seems little dispute that he was informed that Naval officials were attempting to obtain further data for the proper disposition of his case, and that in the interval they wished him to remain with his unit.

Under these circumstances we are sure that, when Johnson absented himself, he assumed completely and voluntarily the risk that he was not in civilian status, and therefore was under an obligation to remain with the MACON. Indeed, under his own version of all the facts, we consider that he is precluded from contending now either that the discharge granted him implied authority to absent himself, or that the Navy was in any way estopped by the issuance of any possible discharge from holding him responsible for his three-year absence.

## VI

One last matter deserves comment, although it was *not* raised either at the trial level or by appellate ▆ defense counsel before us. After findings, the trial counsel offered evidence indicating that the accused had been convicted by court-martial on two occasions prior to his absence—and also prior to November 4, 1950. Yet the Government's position at the trial was that, as of November 4th, he had begun to serve a voluntary extension of his original enlistment—and we have held that, as a matter of law, this was indeed the case. The current Manual for Courts-Martial provides that, for sentencing purposes there may be used only such

evidence as may "relate to offenses committed during a current enlistment, voluntary extension of enlistment, appointment, or other engagement or obligation for service of the accused." Paragraph 75*b*(2).

This language leaves little doubt that a previous conviction which preceded the effective date of a *voluntary* extension of enlistment may not lawfully be used in evidence against an accused person for the purpose of increasing his sentence. For support of this construction, we rely on the following comment contained in the Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951:

> ". . . As a general rule, the previous convictions must relate to offenses committed during a current enlistment, voluntary extension of enlistment, etc. The term 'voluntary extension of enlistment' pertains to present Navy enlistment procedures (Arts C–1406 and C–10304, BUPERS Manual). Such a 'voluntary extension of enlistment' creates a new enlistment for the purpose of determining whether previous convictions are admissible." [Page 77.]

In accord are the holdings of several boards of review. See, e.g., United States v Parker, 5 CMR 781; United States v Eaton, 6 CMR 675. Of course, a different principle is applied when one is retained in the Armed Services due solely to the operation of an involuntary extension of enlistment. See Legal and Legislative Basis, supra.

Accordingly, we hold that the offered evidence of previous convictions should not have been received by the court-martial. Rectification of this error demands that the sentence be revalued by the board of review. Therefore, the record of trial must be remanded to that body for reconsideration of sentence in light of the principles enunciated in this opinion. The findings of guilty are, of course, affirmed.

Judge LATIMER concurs.

QUINN, Chief Judge (concurring in the result):

According to the accused's testimony,

he was given an honorable discharge in the early part of November 1950. However, the following facts are undisputed: (1) On November 1, 1950, the accused was informed that the Navy Bureau of Personnel had indicated that he was not eligible for re-enlistment. At the same time, the accused was advised that his May 1950 voluntary extension of re-enlistment was still binding upon him. (2) The accused remained on board the USS MACON during all of November and December. In that period he performed his regular duties and he drew his regular pay. (3) At the end of December 1950 he applied for leave. At first, the request was denied because "he was upset." Later, however, the commanding officer gave him a pass. He told the accused, "I'm giving you this leave, but I'm telling you now you best let us straighten it [the re-enlistment difficulty] out." The accused accepted the pass. (4) The accused did not return to his ship at the end of his authorized leave.

In view of the foregoing circumstances, the accused is not in a position to maintain that he was not lawfully in the Naval service at the time of his unauthorized absence. United States v Rodriguez, 2 USCMA 101, 6 CMR 101. As a matter of fact, defense counsel in his closing argument at the trial conceded that the accused was in the Naval service. He said:

". . . I submit, Gentlemen, that although the facts indicate that Johnson was in the Navy, and although legally, he may assume that he was in the Navy because the Navy turned down his reenlistment contract and reinstituted the old one year extension, that Johnson in his mind did not leave with the intention to desert. . . ."

Accordingly, I concur in the result.