UNITED STATES, Appellee

v

REECE J. OVERTON, Private E–1,
U. S. Army, Appellant

9 USCMA 684, 26 CMR 464

685

*Captain Arnold I. Melnick* argued the cause for Appellant, Accused. With him on the brief were *Colonel Edward M. O'Connell* and *Lieutenant Colonel W. H. Blackmarr*.

*First Lieutenant Avram G. Hammer* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee* and *Major Thomas J. Nichols*.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

In a common trial with two other prisoners in the post stockade, the accused entered a plea of guilty and was convicted of willful disobedience of a lawful order by a Captain P. G. Kelly "to go to work." No evidence was offered in mitigation and he was sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for five years. The convening authority reduced the confinement to two years but otherwise affirmed the sentence. A board of review also affirmed the conviction. Now the accused contends the court-martial did not have jurisdiction over him.

The claim of lack of jurisdiction is based on the accused's age. See United States v Blanton, 7 USCMA 664, 23 CMR 128. The accused alleges, and the Government does not deny, that he was born on April 1, 1939. On October 21, 1955, while still only sixteen years of age, he enlisted in the Army using his brother's name and school record. His parents had no knowledge of the enlistment, but he wrote to his mother and told her of it. That December, while home on Christmas leave, he discussed the matter with his mother. He promised her he would talk to his company commander about "straightening out the matter and the possibility of getting a discharge from the Army." Sometime in January or February 1956, he did consult his commander in regard to the matter. The substance of their discussion is in conflict.

According to the company command-

er, Captain Chase, he saw the accused during "commanders' time." The only "problem" he considered with the accused was the use by the accused of his brother's name. He advised the accused he would have to obtain a birth certificate "stating his true name." He did not tell the accused he would communicate with his parents with the view to obtaining the accused's discharge from the Army. He said he did not remember any mention of the accused's minority and he did not "believe" the matter was discussed. The accused contends the commander explained to him "about a Minority Discharge" and informed him that if his parents consented he could remain in the Army. Allegedly, he told Captain Chase that "if the records could not be corrected or straightened out then I wanted to get out of the Army."

Shortly after the meeting with his commander, the accused received from his mother an application for a birth certificate. He took it to his company commander and signed it before him; the Captain signed as a witness. The accused left the signed application with the Captain. About a month later his mother wrote to him to advise that the application had been returned to her because his signature had not been notarized. The accused did not say anything about this matter to his commander. On May 26th or 27th, almost two months after he had turned seventeen, the accused went home on a three-day pass. He missed his return ride to camp so he went back home. According to the record of previous con-

victions he was an unauthorized absentee from May 31 to June 24. He was arrested by the sheriff and turned over to the military. He was tried by a special court-martial and sentenced to partial forfeitures and confinement at hard labor for three months. On October 27, he was released and transferred from Fort Knox, Kentucky, to Fort Meade, Maryland.

On November 4, the accused again went absent without leave. He contends that the offense "was directly attributed to the fact" that no one had made "any efforts to get me out of the Army on a Minority Discharge." He went home he says "for the sole purpose of getting my birth certificate." At an unspecified date, he and his father allegedly went to Nashville and obtained the certificate. On January 22, 1957, two and one-half months after his initial unauthorized absence, he was apprehended again by civilian authorities and returned to military control.

Eight days after the accused's apprehension, the accused's mother wrote to the military authorities. She referred to the accused's enlistment at the age of sixteen and said that the accused "still seems just a kid." She hoped that she could "have him home like he should be." The letter was addressed to Fort Meade. It was forwarded from there to Fort McPherson, Georgia, to which the accused had been transferred.

In the meantime, the accused was tried on February 13 by a special court-martial for his unauthorized absence and sentenced to partial forfeitures and confinement at hard labor for six months. The next day he committed the present offense. On March 1, the Personnel Officer at Fort McPherson wrote to the accused's mother referring to her letter of January 30th "concerning a Minority Discharge." He told her the accused had been interviewed regarding his enlistment and "to further process . . . [him] for a possible Minority Discharge it will be necessary" to obtain a record of birth of the accused's brother and an affidavit from her regarding the "present status" of the two boys.

On March 8, 1957, Mrs. Overton wrote to the Personnel Officer giving him the information he desired, together with other details of identification of her sons. On March 14, she again wrote to the Personnel Officer. In her letter she included a birth certificate from her son Reece. She pointed out that she had "been at this since early last summer" and she would be "very thankful" if he could "help any way you can." She also asked whether she had to see a lawyer and requested that if she had to do "anything else or any different" would he "please let . . . [her] no [sic]."

On April 1, the accused came on for trial on the instant charge and pleaded guilty. Apparently, in response to a request from appellate defense counsel, Mrs. Overton has submitted a letter dated August 21, 1957. She attempts to review the matter "from the start" but the details are scant. She says that when the accused came home on leave she asked him "how he got into the Army"; he said that "he just joined." After he "moved" to Fort Knox he came in on a week-end and she "begged him to tell" her about it. She talked to him "a good deal" about it. Then she heard from Captain Chase and the accused. She went to the draft board and talked to a man there. He told her to "just . . . write them myself"; there was "nothing to it." She went to the recruiting office and someone there gave her the same advice. "Just this summer [1957] when he [the accused] was sent to Penn"[1] she went back to the draft board and was advised by a woman there that the matter should have been "fixed . . . up" earlier. She filled out some papers. The letters ends as follows: "I sure would be thankful to you, if you could help my son an[d] get his name straightened out."

Under present law a person under the age of seventeen years is incapable of entering into the enlistment contract. If enlistment is effected, the enlistment is void and the enlistee is not

---

[1] The accused was sent to New Cumberland, Pennsylvania, to serve the confinement adjudged in this case. Apparently, the reference is to this transfer.

subject to trial by court-martial under the Uniform Code of Military Justice. United States v Blanton, supra. On that much the parties are in full agreement. They disagree, however, on the nature and the legal consequences of the evidence after the accused attained his seventeenth birthday. The Government contends that when the accused became seventeen years of age he was fully competent to serve; his service after that date was of such a nature as to effect an implied, or as it is more generally called a "constructive," enlistment. See United States v Johnson, 6 USCMA 320, 20 CMR 36. From that time on, the Government's argument continues, the enlistment was merely a voidable one which still subjects the accused to prosecution for an offense committed before the contract is actually terminated. In an opposite vein, appellate defense counsel maintain the evidence demonstrates the accused did not consent to a "constructive" enlistment, but was merely awaiting administrative disposition of his case. They further contend that the request of Mrs. Overton for release of the accused at a time when the accused had not yet committed an offense terminated military jurisdiction over him.

At the time of accused's enlistment, a male over the age of seventeen had legal capacity to serve in the Army. If he was between the ages of seventeen and eighteen, he was required to have the written consent of his parents or guardian. Act of June 28, 1947, 61 Stat 191, 10 USC § 628 (repealed and re-enacted in August 1956 as 10 USC § 3256). But an enlistment without such written consent is not void. Under the statutes, a nonconsenting parent can apply for the enlistee's discharge, but the enlistee himself has no right or privilege to terminate his service. As far as he is concerned, his military status is not subject to his personal desire or wish. As the United States Supreme Court pointed out, the right to apply for discharge because of nonconsent "is for the benefit of the parent or guardian . . . but it gives no privilege to the minor." Morrissey v

**688**

Perry, 137 US 157, 34 L ed 644, 11 S Ct 57.

These general principles bring us to the specific facts of this case. In January or February 1956, when he discussed his enlistment with Captain Chase, the accused was still only sixteen years of age and his enlistment was void. Had he then decided to leave the service, he would not be subject to trial by court-martial for any existing offense under the Uniform Code. United States v Blanton, supra. According to his affidavit, the accused attempted to stay on. Whatever his desires, however, his enlistment was absolutely void. If the accused changed his status after his seventeenth birthday, that fact has to be shown. As we said in United States v Garcia, 5 USCMA 88, 17 CMR 88, jurisdiction over the person is "not a matter lightly to be presumed, and must be shown clearly." The Government has offered nothing to show such a change of status. On the other hand, the accused contends his continuation in the service was not absolute but contingent upon correction of the record, a condition which was not fulfilled at the time he committed the offense for which he was convicted. In addition, his mother acted affirmatively to terminate his status. Cf. Morrissey v Perry, 137 US 157, 34 L ed 644, 11 S Ct 57 (1890). From either standpoint, there is no satisfactory showing of an implied, or "constructive," enlistment by the accused, or consent by the parent. We hold, therefore, that the court-martial lacked jurisdiction over the accused at the time of trial.

The decision of the board of review is reversed and the findings of guilty and the sentence are set aside. The charge is ordered dismissed.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

My colleagues note that accused's initial underage enlistment was absolutely void, and they find that the Government has made no showing that accused's status ever changed after his

seventeenth birthday; that any continuation in his service was contingent upon a condition which was never fulfilled; and that his mother took affirmative action to terminate accused's status. Accordingly, they conclude the court-martial lacked jurisdiction over accused. I cannot agree.

## I

In United States v Blanton, 7 USCMA 664, 23 CMR 128, we held that a youth under age seventeen is incompetent to acquire military status. We went on to point out, however, that:

". . . Between the ages of 17 and 18 the minor is competent to serve, but his enlistment may be terminated by his parents or guardians, provided they had not consented to it.

"Here, the stipulated facts show that the accused was born on June 9, 1936. Consequently, when he enlisted in the Army on March 9, 1951, he was not yet 15 years of age. He allegedly absented himself on June 8, 1952. At that time, he had not reached his 16th birthday. Thus, at no time was he on active duty at an age when he was legally competent to serve in the military. Cf. Ex parte Hubbard, 182 Fed 76 (D Mass) (1910). In sum, the court-martial had no jurisdiction over the accused."

In *Ex parte Hubbard,* to which we made reference in *Blanton,* the applicable minimum statutory age for enlistment with consent was sixteen. The court there rejected accused's contention that his enlistment was void and his conviction unlawful, holding that one who enlists in the service under the minimum statutory age, who continues to serve after passing that age, "stands like a minor who has enlisted without his parents' consent when over 16." (182 Fed 76, 81.) Likewise, in the recent case of Barrett v Looney, 158 F Supp 224 (D Kans) (1957), affirmed, per curiam, 252 F2d 588 (CA 10th Cir) (1958), the court concluded:

". . . that where one enlists in the Army below the age at which he can be received into the Army, but

remains in the Army beyond the age when he can enlist with his parents' consent, that he is in the Army and that the lack of parental consent is not fatal to the jurisdiction of the Army over him."

Other cases could be cited in support of this rule, and I am confident the great weight of authority upholds the principle. Counsel for accused in their briefs have not called my attention to any decisions contrary thereto and I am certain that had they found any of a persuasive nature they would have cited them to support their arguments. Manifestly, then, unless the authorities I cite are rejected—and I am not inclined to do so—the fact that accused's initial enlistment was void is not necessarily fatal to jurisdiction over him. Accordingly, the next question is whether, after attaining age seventeen, the accused's status changed and he became subject to military jurisdiction.

## II

Constructive enlistment is based upon two elements: Voluntary performance of military duties and acceptance of benefits. United States v Reid, 15 CMR 899. See also Mayborn v Heflebower, 145 F 2d 864 (CA 5th Cir) (1945); United States v Mellis, 59 F Supp 682 (MD NC); Hibbs v Catovolo, 145 F 2d 866 (CA 5th Cir) (1944).

In the words of my associates, accused's affidavit shows he "attempted to stay on." And in fact he did so since, as the majority points out elsewhere, "almost two months after he had turned seventeen, the accused went home on a three-day pass." It is my contention that these facts by themselves suffice to show a constructive enlistment. The tenor of accused's affidavit is not to the effect that he sought to terminate his military status, but rather to assure its continuation by getting his records changed to show his true name so he could remain in the service without fear of later difficulties. Significantly enough, accused does not aver that he ever informed military authorities of his true age and, from his admitted

689

efforts to remain in the Army, it is clear that he voluntarily assumed the obligations of an enlistment contract. And from the fact that he went on pass some two months after turning seventeen, it is reasonably inferable that he willingly not only performed military duties but also accepted services provided by the Government. Moreover, he states in his affidavit that, after his release from confinement as a result of his first absence without leave, he was transferred to Fort Meade, where he was stationed for a short period of time—a further indication of performance of military duties. Finally, both accused's record of previous convictions and the charge sheet reflect that he was receiving pay. Accordingly, I conclude a constructive enlistment is demonstrated.

My colleagues avoid the legal effect of those facts by relying upon a contention that accused's continuation in the service was not absolute but contingent upon correction of the records, which condition was not fulfilled. That is an untenable theory in the light of this record. When accused mentioned his difficulty concerning his identity, he was informed that, in order to change the records to show his true name, he would have to submit the following: (1) an affidavit from his parents as to his true identity; (2) his brother's birth certificate; and (3) his own birth certificate. When, if ever, the first two were furnished is of no consequence as the accused avers in his affidavit that the sole purpose for his second unauthorized absence—which commenced some six months after he turned seventeen and some ten or eleven months after his discussion with his company commander—was to procure the latter certificate. Manifestly, any duty to obtain the necessary information to correct his enlistment records rested on the accused, and failure to satisfy that contingency must be attributed to himself, for the necessary documents were not provided so that the Army could make the requested correction. Surely every undocumented assertion made by a serviceman does not cast on the Government a duty to search for supporting evidence and, in this instance, until the true identity of the accused was established, inquiry about other matters would be useless. Assuming, then, for the sake of argument, that the contingency mentioned by my brothers was real and not imaginary, accused cannot prevail upon that basis. By his own procrastination, he frustrated correction of the records until too late to prevent his constructive enlistment after he reached the age of seventeen years. It thus becomes clear that after that time he was subject to military jurisdiction from which status his parents alone, in the absence of prior consent, had the right or privilege to remove him. Morrissey v Perry, 137 US 157, 34 L ed 644, 11 S Ct 57 (1890).

### III

Accordingly, my next consideration is the majority's contention that accused's mother acted affirmatively to terminate his status. Title 10 USC § 3816 provides:

"Upon the application of the parents or guardian of a regular enlisted member under 18 years of age who enlisted without the written consent of his parents or guardian, the Secretary of the Army shall discharge the member with the pay and form of discharge certificate to which his service entitles him."

However, that is not to say that a nonconsenting parent may, at any time, effectuate a minor son's discharge by making application under the statute. In many cases, Federal courts have considered this problem in connection with the statute then in force and the following quotation from Allen v Wilkinson, 129 F Supp 73, 76 (MC Pa) (1955)—an opinion in a habeas corpus proceeding involving slightly different facts—is illustrative of the holdings:

". . . Even assuming that petitioner enlisted fraudulently when under the statutory enlistment age provided in 10 U.S.C.A. § 628, Act of June 28, 1947, the right to set aside the enlistment would have been only in the parents had they not consented, ex parte Foley, DC WD Ky,

243 F 470, but here they not only consented but were parties to any such fraud if it existed. . . . and certainly, having continued to serve and receive pay after attaining age seventeen, with the parents having consented, the court-martial would have had jurisdiction of offenses committed during such service. Ex parte Hubbard, 182 F 76, 81. . . . Moreover, the overwhelming weight of authority is that neither a minor soldier or his parents, even where no consent has been given, may void such an enlistment or effect the release of such soldier when he is held for a military offense or is under sentence for a military offense.[11]"

"[11]Ex parte Dostal, DC ND Ohio, 243 F 664 (and cases cited); Ex parte Dunakin, DC ED Ky, 202 F 290, 292 (and cases therein cited); Ex parte Beaver, DC ND Ohio, 271 F 493; Ex parte Rush, DC MD Ala, 246 F 172; Ex parte Foley, DC WD Ky, 243 F 470; United States ex rel. Lazarus v Brown, DC ED Pa, 242 F 983; Hoskins v Dickerson, 5 Cir, 239 F 275."

See also In re Miller, 114 Fed 838 (CA 5th Cir) (1902), in which case the minimum statutory age was sixteen and the court said:

". . . It is not reasonable that a minor, of age to enlist, who secures the honorable and responsible position of a soldier in the United States army, could abandon his colors in the face of the enemy and on the eve of battle, and avoid trial and punishment for desertion by the intervention of his parents, who had not consented to his enlistment, but who had taken no step to avoid it before the soldier's arrest for desertion; or that he could endanger the army by betraying its secrets to the enemy, and not be amenable to military jurisdiction, his parents objecting. We cannot approve a view that leads to such results. When an enlisted soldier is imprisoned by military authority upon a charge of desertion or other military crime, a civil court will not interfere on habeas corpus when such military authorities have jurisdiction; and if a minor, over the age of 16 years, enlisted in the service, is so, charged and detained, a civil court will not, either on his own application or that of his parents or guardian, discharge him until he has been released from the prosecution pending against him."

To place this issue in its proper perspective, it is necessary to set out some controlling dates insofar as they can be gleaned from the facts presented to us. The accused reached the age of seventeen on April 1, 1956. He first brushed with the law by going absent without leave on May 31, 1956. At that time his contract of enlistment was only voidable as he had passed age seventeen. He served some forty-five days in confinement and was then returned to a duty status. On November 4, 1956, he again ran afoul of the Code by leaving his station without authority. It was not until January 22, 1957, that he was apprehended by civil authorities. Two days later he was turned over to military control and subsequently transported to Fort McPherson, Georgia, where on January 31, 1957, he was confined. On February 14, 1957, he committed the present offense. The first information I find in the record concerning a request by a parent for the accused's release from the Army consists of a letter written by his mother dated January 30, 1957. That was some eight days after he was confined and awaiting trial for his absence without leave offense. Conceding for the purpose of this issue that she made some inquiry at Selective Service and a recruiting headquarters about her son, she was informed by those agencies that they had no jurisdiction and that she should correspond with the appropriate Army headquarters. Her letter of January 30, 1957, refers to this advice, but it is of some importance to note that at that time she knew the accused had been apprehended for a crime.

It is clear under the authorities I have cited above that any action taken by accused's mother after he was apprehended for his second unauthorized absence is of no consequence, for accused committed the instant disobedi-

ence infraction while he was in confinement as a result of his conviction for that violation of Article 86. Hence, I look at her actions prior to that time. From her statement, it is apparent she did nothing to effect his discharge. She talked to her son, she corresponded with accused and his commanding officer with respect to applying for her son's birth certificate, she went to the draft board for advice, and she spoke with someone in a recruiting office. It is clear the correspondence with the commanding officer was for the purpose of assisting her son in his desire to remain in the service. The dates of the communications and the subject of conversations with the draft board and Selective Service are not fixed, but it matters little whether on those occasions she was seeking to aid him in remaining in the service or trying to return him to civilian life, for it appears she was informed that they could not give her any relief and that she would have to direct her application to Army authorities. She neglected to heed the advice until after she learned that her son was apprehended for an offense. That was some thirteen months after she knew he had fraudulently enlisted in the Army and eight days after he was confined to stand trial. While her application at that time was incomplete, a matter which I disregard, it was too late. In light of those facts, I am unable to agree with my associates that her acts can be effective to terminate accused's status.

Consequently, I am constrained to conclude that the instant court-martial had jurisdiction over accused, and I would affirm the decision of the board of review.