UNITED STATES, Appellee

v

JACK R. HOUT, Sergeant, U. S. Air Force, Appellant

19 USCMA 299, 41 CMR 299

No. 22,161

March 13, 1970

*Major Clarence E. Powell* argued the cause for Appellant, Accused. With him on the brief were *Colonel Bertram Jacobson* and *Lieutenant Colonel Leonard Eichner.*

*Major Donald B. Strickland* argued the cause for Appellee, United States. With him on the brief were *Colonel James M. Bumgarner* and *Lieutenant Colonel Robert W. Vayda.*

## Opinion

QUINN, Chief Judge:

Brought to trial before a general court-martial at McCoy Air Force Base, Florida, on seven specifications of larceny of Government money, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, the accused moved to dismiss the charges on the ground the court-martial had no jurisdiction over him and because he was allegedly denied a speedy trial. The motions were denied. Thereupon, the accused entered a plea of guilty, and the court-martial imposed a sentence extending to a dishonorable discharge.[1]

On this appeal, the accused challenges the correctness of the denial of his mo-

tions. We consider first the jurisdictional question.

The accused was assigned to duty in the Base Finance Office. Discrepancies in the accounts handled by him and others in the office came to the attention of the authorities on January 10, 1968. The next day, the accused was questioned by an agent of the Office of Special Investigations. When he requested counsel, the interview was rescheduled. The events that transpired thereafter are set out in the Appendix to this opinion. It is sufficient to note here that the accused's term of enlistment expired on January 14, 1968, but he was not released from active duty at that time, and formal charges were not preferred against him until September 30, 1968. In essence, the accused contends that sometime during this in-

---

[1] On review, the convening authority mitigated the dishonorable discharge to a period of confinement.

300

terval military jurisdiction over his person ended by operation of law, and he was not triable by court-martial at the time of his arraignment.

Enlistment in an armed force does not establish a contract relationship between the individual and ■ the Government, but a status. United States v Blanton, 7 USCMA 664, 665, 23 CMR 128 (1957). As a result, passage of the date provided for release from the service in the terms of enlistment does not operate of its own force to effect a discharge. United States v Klunk, 3 USCMA 92, 11 CMR 92 (1953); United States v Dickenson, 6 USCMA 438, 20 CMR 154 (1955). In other words, the scheduled date of discharge is not self-executing. Cf. United States v Brown, 12 USCMA 693, 31 CMR 279 (1962); United States v Schuering, 16 USCMA 324, 36 CMR 480 (1966). This principle is embodied in Article 2(1), Code, supra, 10 USC § 802, which, in material part, provides that persons "awaiting discharge after expiration of their terms of enlistment" remain subject to the Uniform Code and trial by court-martial. See United States v Griffin, 13 USCMA 213, 32 CMR 213 (1962).

As of January 14, 1968, the date of expiration of his enlistment, the accused was undeniably entitled to be separated from the service. No effort, however, was made to process him for discharge. The Government contends that the steps it took, as disclosed in the chronology, conformed with the Manual for Courts-Martial provision as to "action . . . initiated with a view to trial" and, therefore, justified the accused's retention "in the service for trial to be held after his period of service would otherwise have expired." Manual for Courts-Martial, United States, 1951, paragraph 11d. Oppositely, the accused maintains that the "administrative hold" placed in effect, unlike arrest or restraint which requires probable cause (United States v Haynes, 15 USCMA 122, 35 CMR 94 (1964)), was insufficient action to justify his retention on active duty beyond the expiration of his enlistment. See Chief Judge Quinn's opinion in

United States v Rubenstein, 7 USCMA 523, 22 CMR 313 (1957). The merits of the opposing contentions need not be considered.

At the expiration of enlistment, a serviceman is, as the Air Force regulations on the subject indi- ■ cate, "absolutely entitled to separation from active duty." Air Force Manual 39–10, August 22, 1966, chapter 3, section A, paragraph 3–1, amended by change 4, May 21, 1969. In a limited number of circumstances, however, he may be retained past the expiration date, despite his personal objection to continued service. One occasion for retention, for example, is that he make good time lost by his own misconduct during the period of service. 10 USC § 972. When no good cause exists to retain him beyond expiration of the enlistment, the serviceman may demand his release, and the Government is bound to grant it. However, if the Government does not affirmatively act to effect his discharge and the accused is satisfied to remain on active duty, the existing status is continued. Performance of assigned duties and receipt of the emoluments and benefits of his rank indicate the serviceman's consent to continuation of his status. United States v Downs, 3 USCMA 90, 11 CMR 90 (1953); United States v Scott, 7. USCMA 655, 29 CMR 471 (1960); United States v Scheunemann, 14 US CMA 479, 34 CMR 259 (1964). Should the serviceman indicate a desire to be discharged, as provided by his enlistment, the Government must comply with his request within a reasonable time or risk the conclusion that his continued performance of duty was not consensual but involuntary. United States v Johnson, 6 USCMA 320, 20 CMR 36 (1955); United States v Overton, 9 USCMA 684, 26 CMR 464 (1958).

Here, there is, in my opinion, no evidence that the accused desired discharge immediately after ■ the expiration of his enlistment. From the Government's evidence and his own testimony, it fairly appears that he performed his assigned duties without

protest; that at the end of each day's work he left the base to spend the night with his family in his apartment in the civilian community and returned voluntarily to the base each morning; that he had the "weekends off" and regularly returned to the base; that he applied for, and received, leave from February 20th to March 21st; and that, without reservation of any kind, he received his allowance for quarters and his regular pay each payday from January through September. On the latter date, according to the chronology, he was informed of the charges. He wrote a letter to the Base Commander requesting individual defense counsel. In that letter, he represented, for the first time, that he had been detained "against . . . [his] will since 13 January 1968." The representation is contrary to the evidence cited above and has no support in the chronology of events. Despite the accused's assertion, the record amply demonstrates that, until the letter, he consented to his retention in the service.[2] From January 14th to September 30th, therefore, the accused retained the unqualified status of a person on active duty subject to the Uniform Code of Military Justice. United States v Downs, supra.

Turning to the effect of the accused's letter of September 30th, it is apparent that, as of that date, the accused was still in a miliary status. His protest against retention did not automatically effect his discharge. At best, it indicated, as above, that he did not consent to further retention in the service notwithstanding his continued performance of duty and continued receipt of pay and allowances. On that day, however, the accused's right to discharge changed. Where previously he was "absolutely entitled to separation" because of the expiration of the period of his enlistment, the filing of charges on September 30th qualified his right to discharge. From that point on he could be retained, even over his protest, until the charges were disposed of by dismissal or trial. Manual for Courts-Martial, supra, paragraph 11d; United States v Schuering, supra.

With the filing of charges against him, the accused was entitled to a speedy disposition of them. United States v Keaton, 19 USCMA 64, 41 CMR 64 (1969). The chronology of events from September 30, 1968, to December 11, 1968, the date of trial, indicates that, allowing for the periods of delay attributable to the accused, the proceedings were reasonably expeditious. United States v Przybycien, 19 USCMA 120, 41 CMR 120 (1969).

The decision of the board of review is affirmed.

DARDEN, Judge (concurring in the result) :

I view the examples of "commence-

---

[2] The dissenting opinion indicates that the accused's leave was subject to unusual limitation on his freedom of movement. The base legal officer testified that the only "guidance . . . [he] gave" in the matter was to the effect that all the individuals involved in the investigation "leave information with the orderly room where they could be contacted in the event it was necessary to contact them." Staff Sergeant D. W. Obenshain, who processed the accused's application for leave, testified that the application contained no telephone number where the accused could be reached during his leave. Since he knew the accused was under investigation, he telephoned the base legal office. He was informed the accused could go on leave "as long as he can be contacted"; then, either he or the accused "suggested" that the accused call "in a few days." According to Sergeant Obenshain, it was not "something out of the ordinary" to ask a man going on leave to call in "if he's going to be needed at the base"; he had himself gone on leave "under these conditions." At no time did Obenshain tell the accused he could not "leave town." Staff Sergeant K. L. Gavin, who was in the base legal office, testified that, on four or five occasions during the period of the accused's leave, the accused telephoned the office. He described each conversation as a "routine call" to determine the status of the investigation and whether the matter was "going to trial." I do not construe the circumstances of the accused's leave as any sort of objection to continuation of his military status during the period of the investigation.

ment of action with a view to trial" contained in paragraph 11d of the Manual for Courts-Martial, United States, 1951, as being illustrative rather than exclusive.[1]

If the accused had been confined in this case there is no question that jurisdiction would have attached and continued. Confinement would have invoked the operation of provisions in the Uniform Code of Military Justice bearing on speedy trial. Because confinement was not considered necessary, jurisdiction was not lost. The interrogation and the administrative hold indicated the accused was likely to be tried by court-martial. United States v Rubenstein, 7 USCMA 523, 22 CMR 313 (1957).

The period between the original discharge date and the start of trial was longer than what I ordinarily would consider reasonable. But the accused had participated in a complicated scheme to defraud the Government and the Government elected to try the accomplices first in order to use them as witnesses for the prosecution. I am satisfied the Government pursued the case with reasonable diligence.

FERGUSON, Judge (dissenting):

I dissent.

By the simple expedient of avoiding a decision on the effect of the Government's action in failing to follow its own regulation and placing upon the shoulders of an untutored accused the responsibility of demanding his rights thereunder, my brothers affirm the conviction in this case. I cannot agree with their decision. Rules of law and rules of procedure are too important to the administration of criminal law.

The Government is indicted by its own chronology of events, a copy of which the majority have appended to their opinion. The most pertinent entry appears on January 14th, the date on which the accused was normally to be released from active duty. However, three days previously, *an administrative hold* was placed on the accused (later renewed to extend to June 30, September 30, and December 30) following discontinuance of an interview of the accused by agents of the Office of Special Investigations when Hout requested counsel.

On January 14, 1968, the accused was "absolutely entitled to separation from active duty" (Air Force Manual 39–10, August 22, 1966, chapter 3, section A, paragraph 3–1, amended by change 4, May 21, 1969), since none of the conditions for involuntary retention of a serviceman beyond the date of the expiration of his term of service (Air Force Manual, supra, paragraph 3–3) applied in his case. He was not released because of the *administrative hold*. While he may have been suspected of an offense, he had not been arrested, confined, or restricted to the base, nor had court-martial charges been preferred against him. Paragraph 11d, Manuals for Courts-Martial, United States, 1951, and 1969 (Revised edition). He was not absent without leave on the date of the expiration of his enlistment (United States v Klunk, 3 USCMA 92, 11 CMR 92 (1953)), nor had his enlistment been extended by law so as to reschedule his date of expiration (United States v Downs, 3 USCMA 90, 11 CMR 90 (1953)). Cf. United States v̇ Hamm, 36 CMR 656 (1966). Only an administrative hold, to insure that he would not be discharged, had been placed in his file. At trial, the Government contended "that was action with a view to trial" and, as such, was sufficient to retain military jurisdiction over the accused. The defense argued to the contrary.

---

[1] "Jurisdiction having attached by commencement of action with a view to trial—as by apprehension, arrest, confinement, or filing of charges—continues for all purposes of trial, sentence, and punishment. If action is initiated with a view to trial because of an offense committed by an individual prior to his official discharge—even though the term of enlistment may have expired—he may be retained in the service for trial to be held after his period of service would otherwise have expired." Paragraph 11d, Manual for Courts-Martial, United States, 1951.

I agree that this was simply not enough. As the Chief Judge stated in his dissent in United States v Rubenstein, 7 USCMA 523, 22 CMR 313 (1957), at page 534:

". . . In my view, the interrogation of the accused and the direction given to him by an investigating agent to report did not constitute such formal proceedings as contemplated either by the civilian rule or the military enlargement of that rule. What the investigating agent could do is one thing. What he actually did is another."

I thoroughly agree with the majority's holding in this case that "When no good cause exists to retain him beyond expiration of the enlistment, the serviceman may demand his release, and the Government is bound to grant it."

We deal here with the question of military jurisdiction over the person of the accused, which, as we said in United States v Overton, 9 USCMA 684, 688, 26 CMR 464 (1958), quoting from United States v Garcia, 5 USCMA 88, 17 CMR 88 (1954), "is 'not a matter lightly to be presumed, and must be shown clearly.' "

As my brothers read the record in this case, they decide that "there is no evidence that the accused desired discharge immediately after the expiration of his enlistment." His purported failure to specifically notify the convening authority that he was being detained against his will, until September 30th when charges were preferred, is viewed as being contrary to the evidence and not supported by the chronology of events. The filing of charges on that date, they contend, changed the accused's status since it vested in the Government a lawful right to retain the accused in service.

I must demur from their concept of what the record reflects. It is obvious that the accused was under investigation and that the administrative action taken to retain him in the service related to that investigation. Rather than placidly accepting, without question, his unwarranted retention in the service, the accused, early in July, *requested*

the appointment of military counsel to advise him. According to a stipulation entered by trial counsel, the staff judge advocate, on July 10th, informed the accused that *"his request was premature but that he would be given an opportunity to resubmit the request at the time charges were preferred."* (Emphasis supplied.) As for the leave granted the accused from February 20th to March 21st, it was not without its limitation. Contrary to regular procedure, the request for leave had to be approved by the base legal officer. The latter granted the leave but instructed the accused that he was to leave word at the orderly room where he could be contacted. The orderly room sergeant testified that, in view of the investigation then underway and since the accused had no telephone, he instructed him to call in every two or three days to learn whether he was needed on the base. This was one of the conditions on which the leave was granted. Considering the accused's duty, the sergeant agreed that this condition was unusual. The sergeant in charge of the base legal office testified that on four or five occasions the accused called him to check on his status with reference to trial. Insofar as the accused's acceptance of pay and allowance for quarters during this period having any significance, I am impelled to ask what else he could have done? The only apparent alternative would seem to have been to refuse these emoluments and to deprive himself and his family of food and shelter. He could not secure a civilian position as he was required to report daily for duty at the base. Even there, he was removed from his military position in the finance office and required to perform with work details, some of which, on occasion, included sentenced prisoners.

As I read the record, it reflects graphically that the accused, unaware that he could have *demanded* his discharge, reluctantly obeyed the orders of his superiors within the military establishment and accepted their word that he was not entitled to his discharge or to legal military assistance until charges were preferred. The action of the Gov-

**304**

ernment in retaining the accused on duty, by the simple act of not handing him his discharge papers, was without lawful authority and contrary to regulations. By the Government's inaction, the accused was deprived of that freedom of movement and choice, constitutionally guaranteed to one in civilian status, to which he was fully and legitimately entitled at the time his enlistment expired. It matters little, in the context of this case, that he was not confined or restricted to the base. The realities of military life are such that had he not reported for duty the day after his termination date, he could undoubtedly have been considered as in violation of the appropriate provision of the Code. His return to civilian life was as conclusively barred as it would have been had he been placed in jail.

The point that should not be lost sight of in this case is that the accused was unlawfully retained in the service and deprived of his right to return to his role of private citizen by the action of the Government. The Government may not act illegally, and if it does so, it may not profit from its illegal action. Silverthorne Lumber Co. v United States, 251 US 385, 64 L Ed 319, 40 S Ct 182 (1920). As Mr. Justice Brandeis stated in his separate opinion in Olmstead v United States, 277 US 438, 484, 72 L Ed 944, 959, 48 S Ct 564 (1928):

". . . The governing principle has long been settled. It is that a court will not redress a wrong when he who invokes its aid has unclean hands. [Extensive citations omitted.]"

In my opinion, this accused was effectively deprived of his liberty to again become a civilian without due process of law, as guaranteed by the Fifth Amendment to the Constitution, by the Government's failure to discharge him and by its ordering him to duty following his date of separation. Constitutional protections are designed so that governmental action, though in good faith, does not infringe upon the constitutional rights of the individual. When we free the Government from that restraint by taking the position, as do my brothers, that the accused did not demand his release until too late, we, in my opinion, unconstitutionally broaden invasions of the military accused's freedom. With this, I cannot agree.

Since I believe that the Government acted illegally in retaining the accused in service, I would hold that it thereby lost its right to subsequently exercise court-martial jurisdiction over him. I would reverse the decision of the board of review and order the charges dismissed.

APPENDIX

CHRONOLOGY

| Date | |
|------|---|
| 10 January 1968 | Comparison of Military Pay Records (AF Forms 470) against Military Payroll Money List (DD Form 115) in McCoy AFB Finance Office reveals erroneous payments of 31 August 1967 (Hazlett), 29 September 1967 (Burroughs), 31 October 1967 (Wilson), 31 October 1967 (Hazlett), and 30 November 1967 (Fulton). |
| 10 January 1968 | Investigation begins; Hazlett confesses; Wilson confesses orally; Burroughs confesses; Fulton confesses; Young confesses. |
| 11 January 1968 | Cole interviewed by OSI. |
| 11 January 1968 | Hout interviewed by OSI; Hout requests counsel and arranges to be re-interviewed 12 January 1968 when accompanied by his civilian lawyer. |

| Date | |
|------|---|
| 11 January 1968 | BJA requests that Hout be placed on administrative hold. BPMRS extends Hout beyond normal DOS, Code E, DOA 14 April 1968. Later extended to 30 June, 30 September, and 30 December 1968, consecutively. |
| 12 January 1968 | Hout interviewed by OSI; Hout's civilian attorney advises OSI Hout will answer no questions until he consults a lawyer familiar with military procedures. |
| 12 January 1968 | Comparison of Military Pay Record (AF Form 470) against Military Payroll Money List (DD Form 115) in McCoy AFB Finance Office reveals erroneous payment of 15 December 1967 to Cassels. |
| 14 January 1968 | Sgt Hout's normal date to be released from active duty. |
| 15 January 1968 | Cassels confesses. |
| 25 January 1968 | OSI issues report re Hazlett. |
| 26 January 1968 | OSI telephones Hout, requesting interview; Hout advises OSI he has not had opportunity to consult counsel; and would notify them. |
| 7–8 February 1968 | Audit conducted on all active Military Pay Records at McCoy AFB. |
| 8 February 1968 | OSI issues pending report re Cole. |
| 9 February 1968 | OSI telephones Hout, requesting interview; Hout informs OSI at that time that upon advice of counsel he will answer no questions. |
| 14 February 1968 | OSI issues pending Report of Investigation re Hout. |
| 23 February 1968 | OSI issues pending Report of Investigation re Hout. |
| 20 February 1968— 21 March 1968 | Hout on leave. |
| 1 March 1968 | OSI issues closed report re Cole, Burroughs, and Wilson. |
| 5 March 1968 | OSI issues pending report re Hazlett. |
| 8 March 1968 | Charges preferred against Young. |
| 15 March 1968 | Article 32 investigation re Young forwarded to convening authority. |
| 15 March 1968 | OSI issues pending Report of Investigation re Hout. |
| 22 March 1968 | OSI issues pending Report of Investigation re Hout. |
| 25 March 1968 | Charges against Young referred to trial. |
| 1 April 1968 | Charges preferred against Cassels. |
| 3 April 1968 | Cassels Article 32 investigation forwarded to convening authority. |
| 5 April 1968 | OSI issues pending Report of Investigation re Hout. |
| 8 April 1968 | OSI issues closed report re Hazlett. |

| Date | |
|---|---|
| 8 April 1968 | Hout interviewed by OSI; while inquiring about procedures used to grant immunity, Hout implies that at least $12,000 had been misappropriated; that an officer assigned to Base Finance shared in the erroneous payments, and that a Lt. Colonel was receiving erroneous payments. |
| 9 April 1968 | Hout re-interviewed by OSI. Hout informs OSI that his lawyer has advised him to make no statement at this time concerning irregularities at McCoy AFB Finance Office. |
| 9 April 1968 | Young trial. |
| 12 April 1968 | Charges against Cassels referred to trial. |
| 12 April 1968 | Hout and his civilian lawyer meet with McCoy AFB Staff Judge Advocate; civilian lawyer will advise SJA if Hout will make a statement. |
| 16–17 April 1968 | Audit conducted on Military Pay Records of all Lt. Colonels assigned to McCoy AFB, Orlando AFB, and Homestead AFB. |
| 17 April 1968 | Charges preferred against Burroughs. |
| 17 April 1968 | OSI issues pending Report of Investigation re Hout. |
| 19 April 1968 | Charges preferred against Fulton. |
| 22 April 1968 | Article 32 Investigation re Burroughs forwarded to convening authority. |
| 25 April 1968 | Hout's civilian attorney advises McCoy AFB Staff Judge Advocate that he will consider advising Hout to make a statement after the Article 32 investigation. |
| 30 April 1968 | Cassels' trial. |
| 2 May 1968 | OSI issues pending Report of Investigation re Hout. |
| 2 May 1968 | Article 32 investigating officer appointed to investigate charges against Fulton. |
| 3 May 1968 | Charges preferred against Wilson. |
| 9 May 1968 | Article 32 investigation re Wilson convenes. |
| 9 May 1968 | Article 32 investigating officer's report re Fulton completed and typed. |
| 10 May 1968 | Charges against Burroughs referred to trial. |
| 15 May 1968 | OSI issues pending Report of Investigation re Hout. |
| 24 May 1968 | Burroughs' trial. |
| 24 May 1968 | Article 32 investigating officer's report re Fulton signed and forwarded to convening authority. |
| 27 May 1968 | Article 32 investigation re Wilson forwarded to convening authority. |
| 31 May 1968 | Charges against Wilson referred to trial. |
| 31 May 1968 | Charges against Fulton referred to trial. |
| 10 June 1968 | The Judge Advocate General determines not to forward Young case to Board of Review pursuant to Article 69, UCMJ. |

| Date | |
|------|---|
| 20 June 1968 | Wilson trial. |
| 21 June 1968 | Fulton trial. |
| 21 June 1968 | OSI issues pending Report of Investigation re Hout. |
| 10 July 1968 | Hout requests one of four named military lawyers be made available as his counsel. |
| 11 July 1968 | The Judge Advocate General determines not to forward Cassels case to Board of Review pursuant to Article 69, UCMJ. |
| 16 July 1968 | Charges preferred against Cole. |
| 17 July 1968 | Article 32 investigation into charges against Cole convened; Fulton refuses to testify. |
| 18 July 1968 | Charges preferred against Hazlett. |
| 19 July 1968 | Article 32 investigation re Hazlett convenes. |
| 31 July 1968 | OSI issues pending Report of Investigation re Hout. |
| 2 August 1968 | Article 32 investigation re Hazlett forwarded to convening authority. |
| 6 August 1968 | The Judge Advocate General determines not to forward Fulton case to Board of Review pursuant to Article 69, UCMJ. |
| 5–12 August 1968 | Fulton on emergency leave. |
| 7 August 1968 | Charges against Hazlett referred to trial. |
| 9 August 1968 | The Judge Advocate General determines not to forward Burroughs case to Board of Review pursuant to Article 69, UCMJ. |
| 13 August 1968 | Article 32 investigation re Cole reopens to take Fulton's testimony. |
| 14 August 1968 | Article 32 investigation re Cole forwarded to convening authority. |
| 20 August 1968 | The Judge Advocate General determines not to forward Wilson case to Board of Review pursuant to Article 69, UCMJ. |
| 20 August 1968 | Hazlett trial. |
| 20 August 1968 | Charges against Cole referred to trial. |
| 19 September 1968 | Cole trial. |
| 30 September 1968 | Charges preferred against Sgt Jack R. Hout. |
| 30 September 1968 | Article 32 investigation re Hout convened and recessed. Sgt Hout wrote to convening authority requesting one of four named individual defense counsel be made available. In this letter, he alleged he had been "detained in the USAF . . . against . . . [his] will since 13 January 1968." |
| 3 October 1968 | Article 32 investigation re Hout reconvenes; Sgt Hout appeals determination that four counsel requested on 30 September 1968 are not available; investigation recesses. |
| 11 October 1968 | Article 32 investigation re Hout reconvenes. |

| Date | |
|---|---|
| 14 October 1968 | Article 32 investigation re Hout reconvenes. |
| 24 October 1968 | OSI issues closed report re Hout. |
| 29 October 1968 | Article 32 investigation re Sgt Hout forwarded to convening authority. |
| 13 November 1968 | Charges against Sgt Hout referred to trial. |
| 22 November 1968 | Defense Counsel requests delay of Hout trial until approximately 10 December 1968. |
| 2 December 1968 | Sgt Hout requests Major James Smith be made available as individual defense counsel. |
| 5 December 1968 | Charges served on Sgt Hout. |
| 11 December 1968 | Hout trial. |