# UNITED STATES

v.

James M. COOK, Jr., 515 58 0951 Seaman Recruit E–1, U. S. Navy.

NCM 75 1551.

U. S. Navy Court of Military Review.

23 Oct. 1975.

LT Michael C. Barr, JAGC, USNR, Appellate Defense Counsel.

LT Mark D. Wigder, JAGC, USNR, Appellate Government Counsel.

Before EVANS, MALLERY and GREGORY, JJ.

## DECISION

EVANS, Senior Judge:

Appellant contrary to his pleas stands convicted of aggravated assault in violation of Article 128, Uniform Code of Military Justice. The sentence adjudged by members provided for a bad conduct discharge, six months confinement and forfeiture of $229.00 per month for a like period. The convening authority reduced the confinement to four months but otherwise approved the sentence.

At trial, and now before us, it is urged there was no court-martial jurisdiction over appellant. We disagree and affirm.

■ Appellate defense counsel takes the position appellant, because of his civilian criminal difficulties, was coerced into joining the Navy. Counsel principally relies on *United States v. Russo*, 23 U.S.C.M.A. 511, 50 C.M.R. 650, 1 M.J. 134 (1975) and *United States v. Catlow*, 23 U.S.C.M.A. 142, 48 C.M.R. 758 (1974). Appellant's trial testimony coincides with the below stipulations of fact and testimony of the recruiter:

## STIPULATION OF FACT

"On 20 July 1973, the accused was arrested for petty larceny. Sometime between the 1st and the 15th of August 1973, a preliminary hearing was held on the petty larceny charge. Again, some date between the 15th and the 20th of August 1973, the accused was arrested for throwing a deadly missile into an occupied vehicle. On 20 September 1973, the accused was tried for petty larceny, the charge was reduced to trespass, the accused was sentenced to probation for at least 1 year. On 28 September 1973, a preliminary hearing was held on the charge of throwing a deadly missile into an occupied vehicle. The judge continued the case until 12 October 1973. On 4 October 1973, probation for the trespass offense was terminated. That on 11 October 1973, the accused joined the Naval Reserve, the U.S. Naval Reserve CACHE Program, with delayed active duty. On 12 October 1973, the accused went to trial for the throwing a deadly missile into an occupied vehicle charge, this was reduced to

malicious injury to personal property, and nol-prosed by the State's Attorney's Office. On 27 December 1973, the accused commenced active duty at Naval Training Center, Orlando, Florida." (R. 17)

## STIPULATED TESTIMONY OF CHIEF PETTY OFFICER STANLEY

"That he recalls the accused in this case, James Milton Cook, he recalls signing him up the the U.S. Navy, in December 1973, or October 1973. At the time that the accused was signed up he was not in a probationary status, that probation had been terminated on 4 October 1973. The Chief is convinced that the charges pending against the accused for throwing a deadly missile had been dismissed at the time that the accused signed up in the U.S. Navy. Chief Stanley made no agreement, nor was he part of any agreement with the judge to drop the charges in return for the accused's joining the U.S. Navy. His appearance in court was restricted solely to answering the judge's question as to whether the accused was physically and mentally qualified to join the U.S. Navy. The Chief would further testify, that currently, the Navy Recruiting Directives provide a mandatory waiting period between the termination of probation and joining the U.S. Navy and in December of 1973 there was no such waiting period, if probation was terminated one day, the accused could sign up and join the Navy on the following day." (R. 21)

As we view the record evidence Chief Stanley was, within the meaning of *Catlow*, but an innocent bystander along the path to enlistment. Appellant conceded at trial he was not advised he was going to jail. (R. 8, 9) It was because of the second offense appellant calculated he might be going to jail based on the advice of the Public Defender. Therefore, we may easily distinguish the case at bar from the facts in *Catlow* where the recruiting Sergeant *obtained* Catlow's release from jail to effect the completion of enlistment forms. Chief Stanley, at worst, told the judge appellant was physically qualified for enlistment. Therefore, we do not find the enlistment was involuntary.

█ That does not end the matter since we find appellant was enlisted contrary to the recruiting regulations in effect during October 1973. The 1973 regulations covering enlistments were set out in COMNAV-CRUITCOM INSTRUCTION 1130.8, Navy Recruiting Manual Enlisted. Paragraph 1–26 lists the following persons as not eligible to enlist:

"1–26. *WAIVERS NOT AUTHORIZED.* Application from individuals in the following categories *will be rejected.*

a. Any application for any program who is awaiting trial, awaiting sentence, or on supervised probation as a result of violation of the law shall be rejected.

b. Any applicant who has been placed on probation or given a suspended or deferred sentence contingent on his enlistment shall be rejected.

c. *Any applicant who has been released from probation, suspended sentence, or any other form of civil restraint for the purpose of enlisting shall be rejected.*

d. Any applicant whose religious beliefs conflict with the principle that voluntary enlistees/reenlistees are subject to unrestricted service on a 24-hour-a-day, seven-day-a-week basis.

e. A woman applicant who is pregnant." [Emphasis supplied]

The stipulated testimony of the recruiter indicates he justified the enlistment on the basis appellant was released from probation supervision on 4 October. We believe the recruiter was placed on notice by his appearance in the civilian court that the judge was considering release of appellant from probation supervision for the purpose of joining the Navy. While it may be the recruiter was not part of any agreement with the judge to drop the charges in return for joining the Navy, he was placed on notice civil authorities were considering releasing appellant for that purpose. The pertinent regulation emphasized above prohibits such an enlistment. Therefore, we hold the enlistment contract of 11 October

1973 was void. *United States v. Russo, supra.*

We should note the recruiter was correct in stating that in 1973 an applicant could be immediately accepted after probation was terminated (paragraph 1–25). The present regulation, COMNAVCRUITCOM IN-STRUCTION 1130.8A, paragraph 2–I–5c states:

"c. Applicants who are released from parole or supervised, conditional probation early are eligible to commence processing at the time the complete term of parole or probation would have terminated or in six months, whichever comes first." (underscoring in text)

However, the 1973 regulation governing release from probation solely to join the Navy is still in effect (paragraph 2–II–21). In summary, we believe that the sense of the regulations in October 1973 permitted enlistment of appellant after he was released from probation. However, we consider an applicant could not be enlisted if such probation release was contingent on enlistment in the military service. We believe the enlistment contract was effected in violation of the applicable 1973 regulation, paragraph 1–26c.

We now review the two contractual relationships between the Government and this appellant. As best we can determine, appellant truthfully answered questions on the enlistment application and did list his various prior civilian convictions (appellate defense exhibit A). On 12 October the day after appellant enlisted in the Naval Reserve he was free of any involvement with civil authorities. Stated another way, appellant received the benefit of his bargain. *See United States v. Catlow, supra,* pages 146, 762, and *United States v. Barrett,* 23 U.S.C.M.A. 474, 50 C.M.R. 493, 1 M.J. 74 (1975). However, he did not remain in this "Reserve" status. It is here that appellant's jurisdictional argument fails. There is clear evidence his status changed and this distinguishes our case from *Russo.* In that case Chief Judge Fletcher held a valid enlistment contract is precluded where recruiter misconduct is responsible for its execution. He also considered there was no evidence in Russo's case to show a "change of status" after the initial void contract was made, *In re Grimley,* 137 U.S. 147, 157, 11 S.Ct. 54, 34 L.Ed. 636 (1890). According to Judge Fletcher, the change of status i. e. civilian to military, is not achieved where the contract is made in violation of a recruiting regulation. The Chief Judge states, at page 513 of 23 U.S.C.M.A., 50 C.M.R. 652, 1 M.J. 137:

*"The necessary prerequisite to effect a voluntary change in status from civilian to soldier is valid enlistment contract or, a legitimate constructive enlistment.* Previously we have held that 'fairness prevents the Government from . . . relying upon a constructive enlistment as a jurisdictional base' where Government agents acted improperly in securing an individual's enlistment. [citations omitted] Similarly, the Government would be obligated to terminate an enlistment where a recruiter knowingly enlisted or aided in enlisting an individual who had given timely notice that he was disqualified for military service. [Citation omitted]

"Because fraudulent enlistments are not in the public interest, we believe that common law contract principles appropriately dictate that where recruiter misconduct amounts to a violation of the fraudulent enlistment statute, as was the situation here, the resulting enlistment is void as contrary to public policy. *Hence the change of status alluded to in Grimley never occurred in this case."* [Emphasis supplied]

The question is how is a "change in status" effected? In *Grimley* (137 U.S. at page 157, 11 S.Ct. 54) it is stated that an oath of allegiance is the pivotal fact which changes the status from that of civilian to soldier. Since the oath and contract are practically speaking accomplished during the same general time frame, I believe Judge Fletcher would consider the terms "oath of allegiance" and "valid enlistment" contract to be synonymous. In *United States v. Overton,* 9 U.S.C.M.A. 684, 26 C.M.R. 464 (1958) the accused enlisted when

he was under the age of 17. This enlistment was void. Overton brought the matter to attention of his Company Commander three months after he came on active duty. Chief Judge Quinn recognized Overton had during the initial portion of his enlistment desired to remain in the Army. The Chief Judge stated this naked desire was irrelevant since the original contract was void. The crucial point was whether Overton changed his "status". Judge Quinn noted, "The Government has offered nothing to show such a change of status", at pages 688, 468. Presumably, a status change would have been achieved had another oath and enlistment contract been effected when Overton was more than 17, but less than 18 years of age with the "consent of the parent", *Overton, loc. cit.*

■ Our record shows appellant took another oath after his initial void oath. Appellate Defense Exhibit B is an enlistment contract executed on 27 December 1973. Appellant does not urge this contract is invalid. From 11 October to 26 December appellant was on inactive duty in the United States Naval Reserve. He was not subject to the daily rigors of service life, particularly court-martial jurisdiction. Exhibit B was executed at Armed Forces Examining and Entrance Station, (AFEES) Oklahoma City, Oklahoma. Appellant's parents lived in that state; and probably that particular city since it is listed as his home of record. The exhibit shows that on 26 December 1973 appellant was honorably discharged from the Naval Reserve. On 27 December appellant executed another enlistment contract and gave another oath for the purpose of entering the Regular Navy. I believe this is what Chief Judges Quinn and Fletcher intended in their respective opinions in the *Overton* and *Russo* decisions with respect to "change of status" evidence. In *Overton's* case, he had to make another enlistment contract with the consent of a parent. I believe Chief Judge Fletcher would have found a "legitimate constructive enlistment" if, for example, Russo had been cured of his physical malady and had decided to serve the remainder of his void enlistment. Common sense dictates the

misconduct of the recruiter must have a reasonable termination date. I believe this is the ultimate aim of the *Russo* decision. If through the passage of time the over-reaching of the recruiter pales, then a legitimate constructive enlistment may be found. For example, where an accused serves honorably against the Communist enemy he should be entitled to his honorable discharge, the badge worn by the loyal citizen. It will not do for a court to deprive him of this badge of respect because years before he was taken advantage of by a recruiter. Therefore, following the sense of the law announced in the *Russo* decision, we hold that recruiter misconduct cannot be considered beyond the date the void contract expired; in the case at bar, 26 December 1973. Each enlistment contract is considered as a separate transaction and the facts surrounding each must be separately evaluated, *see generally, Smith v. United States*, 292 U.S. 337, 54 S.Ct. 721, 78 L.Ed. 1295 (1934) and *United States v. Smith*, 15 C.M.R. 543, 547 (N.B.R.1954) Since there is no assertion of any impropriety in the contract covering the appellant's enlistment in the United States Navy, as opposed to the Naval Reserve, there was court-martial jurisdiction over appellant. In sum, a change of status was accomplished by a subsequent valid enlistment contract.

So we may not be charged with legal "hair splitting," some discussion of the CACHE program is indicated. This program provides for the enlistment of persons in the Naval Reserve for subsequent enlistment in the Regular Navy. Paragraph 12–7b of the regulations in effect during 1973 provided:

"b. The Commanding Officer, Navy Recruiting District may authorize the discharge of [Reserve] CACHE personnel when the CACHE applicant is not eligible for enlistment USN. *The reasons may include but are not limited to:*

(1) Does not now meet dependency criteria.

(2) Does not now meet physical standards for enlistment USN, and an extension in CACHE Program as authorized in para-

graph 12–6.a.(1).(b) is not considered appropriate.

(3) Indebtedness to a degree that the individual is considered a financial risk.

(4) Women who refuse to enlist USN." [Emphasis supplied]

Paragraph 12–10 provides in part only for an abbreviated review of eligibility standards to enlist in the Regular Navy where there is a prior Reserve enlistment:

"12–10. *PROCEDURES UPON ENLISTMENT, USN.* The USNR (CACHE) Enlistment Contract worksheet may be updated as appropriate for completion of the USN Enlistment Contract (DD Form 4). It will not be necessary to complete new police record checks or undergo a complete physical examination unless there is a change in either civil involvement or physical condition. A new physical examination may be given, however, if deemed appropriate by the recruiting/enlisting activity."

In 1973 the Recruiting Manual also provided for the contingency of changes in enlistment eligibility after execution of the Reserve contract. Paragraph 12–11a states:

"12–11. *CHANGE IN ENLISTMENT ELIGIBILITY.* a. *Any change in basic eligibility for enlistment will be viewed from a waiver standpoint.* Changes which are waiverable by CO, NRD, CNRA or COMNAVCRUITCOM will be processed accordingly. *Changes which render the applicant totally ineligible for enlistment, will be processed for discharge from CACHE* in accordance with the procedures set forth in paragraph 12–7 of this chapter." [Emphasis supplied]

The question arises what if the Naval Reserve CACHE has a "change of heart" and will not enlist in the Regular Navy. Paragraph 12–8 of the Manual is instructive:

"12–8. *REFUSAL TO REPORT FOR ENLISTMENT USN.* In all cases where an applicant has enlisted in the USNR (CACHE Program) and subsequently refuses to enlist USN, the following action will be taken:

a. If personal contact is possible, counsel the applicant concerning action that may be taken by COMNAVCRUITCOM i. e. ordered to extended active duty in USNR, declaration of unauthorized absentee status and concurrent issuance of ABSENTEE WANTED BY THE ARMED FORCES (DD 553), etc.

b. If the applicant persists with refusal to enlist USN, notify COMNAVCRUITCOM (Code 33) by letter. Such letter will include all circumstances surrounding the applicant's refusal to enlist USN and a definite recommendation of action that is considered appropriate by the Commanding Officer of the NRD that effected the CACHE enlistment."

From the above 1973 regulations, it is clear the CACHE Program intends for two enlistment contracts to be executed. The initial contract connects the enlistee with the Naval Reserve, but he continues in his civilian role. Later, he is discharged from the Reserve component of the Navy and offered a contract covering Regular Navy enlistment. From paragraph 12–8 it appears he may refuse to enter into the second contract. When this occurs the enlistee may hope he will not be ordered to active duty in a *Reserve status.* The important point is he is not forced into executing the second contract. An enlistment in the Regular Navy is not coerced. Therefore, we consider the CACHE Program provides in the usual case a "change in status" before an applicant is eventually placed on active duty. In view of this contemplated change of status we consider the holding of *United States v. Russo, supra,* does not apply to the enlistment contract executed in December 1973.

Accordingly, the findings of guilty and the sentence as approved below are affirmed.

Judge MALLERY and Judge GREGORY concur.